# Wytheville.

## W. B. CHALKLEY V. ATLANTIC COAST LINE RAILROAD COMPANY.

### June 14, 1928.

Argued and submitted before Judge Holt took his seat.

1. MASTER AND SERVANT—*Libel and Slander—Letter Discharging Servant Alleged to be Libelous—Qualified Privilege—Malice—Case at Bar.*—In the instant case plaintiff brought his action for libel against defendant, his master, basing the action upon a letter discharging him. The occasion therefor was one of qualified privilege. The discharge of plaintiff and the communication upon which the action is based, being so privileged, the question was not whether the charge was true or false, but only whether the privilege was abused or the language employed was uttered and published with malice.

2. LIBEL AND SLANDER—*Malice—Privilege—Questions of Law and Fact—No Evidence to Show Malice.*—Generally, malice is a question of fact to be submitted to a jury, but where the communication is privileged, unless there is evidence from which a jury may fairly conclude that there was malice, there can be no recovery.

3. LIBEL AND SLANDER—*Malice—Privilege—Questions of Law and Fact—No Evidence to Show Malice.*—If the plaintiff fails to offer evidence of an extrinsic character to prove actual malice on the part of the defendant, in the publication of a libel on a qualifiedly privileged occasion, and if the language of the communication and the circumstances attending its publication by the defendant are as consistent with the non-existence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant.

4. LIBEL AND SLANDER—*Privilege—Definition of Malice.*—The malice which avoids the privilege is actual or express malice, existing as a fact at the time of the communication and which inspired or colored it. Such malice exists where one casts an imputation which he does not believe to be true, or where the communication is actuated by some sinister or corrupt motive or motives of personal spite, or ill-will, or where the communication is made with such gross indifference to the rights of others as will amount to a wilful or wanton act.

5. Libel and Slander—*Questions of Law and Fact—Malice.*—The trial court may properly refuse an instruction submitting the question of malice to the jury where there is no legal evidence in the record to suggest malice, but where there is evidence tending to show malice in the utterance of the words spoken, or in the published communication, that question cannot be properly taken from the jury. Where the defendant acts in performance of a duty, legal or social, or in defense of his own interests, the occasion is privileged and there is a legal presumption that he acted without malice which the plaintiff must rebut by evidence. Strong or violent language disproportionate to the occasion, however, may raise an inference of malice, and thus lose the privilege which would otherwise attach to it.

6. Libel and Slander—*Presumbtion of Malice—Privilege.*—Ordinarily the law implies malice from the use of words defamatory or insulting. But the presumption is the other way, where the occasion of the publication is privileged, and the onus is then upon the plaintiff to prove malice in fact.

7. Libel and Slander—*Master and Servant—Discharge of Servant—Evidence to Show Malice.*—The instant case was an action for libel by plaintiff, a telegraph operator, against defendant railroad. Plaintiff based his action upon a letter from defendant's superintendent discharging him. Plaintiff, to show malice in the superintendent, testified to three incidents between him and the superintendent: First, that the superintendent had asked him to take a job as car inspector and had not seemed to like his refusal to do so. Secondly, that he had once seen a letter from the superintendent objecting to a train being stopped to let him off, and went to see the superintendent about it, and denied to him that it was his fault; whereupon the superintendent replied: "Don't make any more; mistakes cost too much." And thirdly, that upon being hurt he had received $170.00 from the company, and that he had heard, and told the superintendent that he had heard, that the superintendent said that he "did not know where they got such operators from;" that there was plaintiff who got a little lick on the arm and they had to give him $170.00. Palintiff testified that his relations with the company were not affected by these incidents. Defendant testified that he had no recollection of the incidents, and that he had no ill feeling towards plaintiff.

   *Held:* That this evidence was entirely inadequate to support the contention that the qualified privilege was abused in the discharge of plaintiff.

8. Libel and Slander—*Privilege—Letter of Master Discharging Servant—Necessity of Extrinsic Evidence of Malice—Case at Bar.*—In the instant case plaintiff, a telegraph operator, brought an action against defendant railroad for libel, basing the action upon a letter from de-

fendant discharging him for alleged drunkenness. Plaintiff denied that he was drunk. Defendant's superintendent thoroughly investigated that question, hearing many statments both pro and con. The superintendent testified that after conference with another officer of defendant it was decided that for the good of the service plaintiff should be discharged. He further testified that he had no animus or prejudice against plaintiff. The weight of the evidence submitted to the superintendent supported his conclusion that plaintiff should be discharged. But that was not the question which the court had to consider, because whether the evidence was true or not, if the conclusion to discharge plaintiff was reached and acted on in good faith, no action would lie therefor.

*Held:* That the court did not err in sustaining a demurrer to the evidence, plaintiff having failed to show any malice or abuse of privilege.

9. LIBEL AND SLANDER—*Publication—Whether Dictation to a Stenographer Constitutes a Sufficient Publication.*—Where the communication of the libelous matter to the plaintiff is in the customary and usual course of the business of the defendant, in the discharge of an ordinary business duty, and is merely dictated to a stenographer, or copyist, who is charged with the duty of transcribing it, this is not such a publication of the alleged libel as will support an action.

10. LIBEL AND SLANDER—*Publication—Whether Dictation to a Stenographer Constitutes a Sufficient Publication—Privilege.*—Libelous matter is privileged when dictated to a stenographer in the discharge of ordinary business.

11. LIBEL AND SLANDER—*Publication—Whether Dictation to a Stenographer Constitutes a Sufficient Publication—Privilege—Officer of Corporation Dictating to Stenographer of the Corporation.*—The dictation by an officer of a corporation to a stenographer of the corporation, of libelous matter concerning firm business, does not constitute a publication of the letter. There is, in fact, but one act by the corporation, and those engaged in the performance of it are not to be regarded as third persons, but as common servants engaged in the act. Where the communication is privileged the typist has his duty to discharge in the ordinary course of business in connection with the transcription of the communication.

12. LIBEL AND SLANDER—*Publication—Whether Dictation to a Stenographer Constitutes a Sufficient Publication—Privilege—Subterfuge—Case at Bar.*—The rule that dictation to a stenographer in the ordinary course of business is not a sufficient publication cannot be invoked for the protection of those who use it as a mere subterfuge where the libelous matter is in fact communicated to one who has no duty to perform in connection therewith, or is otherwise actually disseminated. But it does apply to the instant case where the facts are

undisputed and all that was done by the defendant's agents was to dictate the order of dismissal in appropriate language, in the usual course of business, and communicate it through the customary channels to the employee.

13. LIBEL AND SLANDER—*Publication—Whether Dictation to a Stenographer Constitutes a Sufficient Publication—Privilege—Subterfuge—Case at Bar.*—If a master, in the usual course of his business, merely dismisses his employee when he has a right to dismiss him, and uses temperate language for the purpose and communicates it in writing to the employee, but to no one else, this is not a publication which will support such an action. In the instant case this was in effect all that the defendant had done. Being a corporation, it could only speak through its agents. The discharge of the plaintiff was a single act in which only two parties participated, one the defendant, the master, speaking through its superintendent, and the other the plaintiff, the employee. There being no evidence showing any publication, there was no basis for the action.

Error to a judgment of the Circuit Court of Sussex county, in an action of trespass on the case. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Harry L. Snead,* for the plaintiff in error.

*Mann & Townsend,* for the defendant in error.

PRENTIS, P., delivered the opinion of the court.

The only questions which we are called upon to consider in this case arise under the third and fourth counts of the declaration charging libel.

The plaintiff, Chalkley, was a telegraph operator with an experience extending over a period of twenty-three years, during eight years of which he was employed by the defendant company. October 30, 1923, he was employed as telegraph operator at Weldon, N. C.

This is the communication alleged to be libelous:
"ATLANTIC COAST LINE RAILROAD COMPANY.
"Richmond, Virginia, November, 9, 1923.
"W. B. Chalkley,
"Drewry's Bluff, Va.
"Dear Sir:
"Following received from Superintendent:
" 'In connection with recent investigation covering conduct of operator W. B. Chalkley on October 30th. Please dismiss operator Chalkley from service, for violation of Rule "G" and improper conduct on a passenger train.'
                    "Yours truly,
                        "A. A. McKAY,
                        "Chief Dispatcher."

Rule "G" so referred to, reads thus: "The use of intoxicants by employees while on duty is prohibited. Their use, or frequenting of places where they are sold, is sufficient cause for dismissal."

The trial court sustained a demurrer to the plaintiff's evidence, entered judgment in favor of the defendant, and the assignment of error is that this ruling is erroneous.

The rules of law applicable to such cases have been frequently stated.

In *Brown* v. *Norfolk & Western Ry. Co.*, 100 Va. 619, 42 S. E. 664, 60 L. R. A. 472, which was the case of a fireman discharged for improper language and conduct, we find this comprehensive statement: "Notwithstanding the fact, however, that the case was heard on a demurrer to the evidence, we repeat that the question here is not as to the truth or falsity of any statement made in the published order, but merely as to the motive and intent by which the railway company was inspired. This communication being

privileged, plaintiff in error can only prevail by show-ing that the defendant availed itself of the occasion, not for the purpose of protecting its interests, but to gratify its ill will.   Upon this issue the burden of proof is upon the plaintiff in error.''

[1] Applying this to the facts of this case, it is manifest, as was held by the trial court, that the occasion was one of qualified privilege; that the discharge of Chalkley and the communication upon which the action is based, being so privileged, the question here is not whether the charge was true or false, but only whether the privilege was abused or the language employed was uttered and published with malice.

[2] Generally, of course, malice is a question of fact to be submitted to a jury, but where the communication is privileged, unless there is evidence from which a jury may fairly conclude that there was malice, there can be no recovery.

[3] It is said in *National Disabled Soldiers' League* v. *Haan*, 55 App. D. C. 243, 4 Fed. (2d) 441, that ''if the plaintiff fails to offer evidence of an extrinsic character to prove actual malice on the part of the defendant, in the publication of a libel on a qualifiedly privileged occasion, and if the language of the communication and the circumstances attending its publication by the defendant are as consistent with the non-existence of malice as with its existence, there is no issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant.''

[4] In *International & G. N. R. Co.* v. *Edmundson* (1920), (Tex. Com. App.) 222 S. W. 183, we find this definition of malice, as used in this connection:   ''The malice which avoids the privilege is actual or express malice, existing as a fact at the time of the communication and which inspired or colored it.   Such malice

exists where one casts an imputation which he does not believe to be true, or where the communication is actuated by some sinister or corrupt motive or motives of personal spite, or ill-will, or where the communication is made with such gross indifference to the rights of others as will amount to a wilful or wanton act."

[5] The court may, therefore, properly refuse an instruction submitting the question of malice to the jury where there is no legal evidence in the record to suggest malice, but where there is evidence tending to show malice in the utterance of the words spoken, or in the published communication, that question cannot be properly taken from the jury. Where the defendant acts in performance of a duty, legal or social, or in defense of his own interests, the occasion is privileged and there is a legal presumption that he acted without malice which the plaintiff must rebut by evidence. Strong or violent language disproportionate to the occasion, however, may raise an inference of malice, and thus lose the privilege which would otherwise attach to it.

[6] As is said in *Strode* v. *Clement*, 90 Va. 556, 19 S. E. 177: "Ordinarily the law implies malice from the use of words defamatory or insulting. But the presumption is the other way, where the occasion of the publication is privileged, and the onus is then upon the plaintiff to prove malice in fact."

These general principles are fully recognized in this jurisdiction. *Dillard* v. *Collins*, 25 Gratt. (66 Va.) 343, 353; *Chaffin* v. *Lynch*, 83 Va. 106, 1 S. E. 803; *Reusch* v. *Roanoke, etc., Co.*, 91 Va. 534, 22 S. E. 358; *Brown* v. *N. & W. Ry. Co.*, 100 Va. 619, 42 S. E. 664, 60 L. R. A. 472; *Tyree* v. *Harrison*, 100 Va. 542, 42 S. E. 295; *Ramsay* v. *Harrison*, 119 Va. 682, 89 S. E. 977; *Spencer* v. *Looney*, 116 Va. 774, 82 S. E. 745; *Vaughan* v. *Lytton*,

126 Va. 671, 101 S. E. 685; *Lightner* v. *Osborn*, 142 Va. 19, 127 S. E. 314; Newell on Slander & Libel, (2d ed.) 424.

With these principles in mind, we must, of course, consider the evidence.

According to the plaintiff's account, the incident which resulted in his dismissal occurred on October 30, 1923, while he was on his way from Drewry's Bluff, Va., his home, to his place of work at Weldon, N. C., traveling on an interstate pass, lawfully issued by the proper officials of the company. He says he had worked all the night before and walked a considerable distance that morning, that he had only drunk a bottle of Coca-Cola, and that growing sleepy he left his seat and went out on the platform of the train, because at Stony Creek he was to receive his check from the company's operator there. He says that while he was so standing on the platform, Conductor James, who was in charge of the train, came up behind him and caught him by the left arm, and gave it a sudden jerk, which on account of a previous hurt of the same arm while in the employ of the company, caused him a great deal of agony and suffering necessitating a doctor's treatment when he arrive at Weldon. After leaving Jarratt's station, he had further unpleasant words with Conductor James, who threatened to throw him in jail. He also says he had some previous misunderstanding over a pass with Conductor James.

Growing out of this occurrence, E. P. Laird, the superintendent of the Richmond district of the company, who is charged with the duty of exercising general supervision over the work of such employees as the plaintiff, with noting their observation of rules and instructions, and required to discipline and dismiss them, if it became necessary, received a report from

Sergeant Angle, of the police department, forwarded with a letter from the Inspector of Police McElroy, which reached him October 31, 1923.   The letter from McElroy reads:

"I am handing you herewith enclosed a copy of Sergeant Angle's report referring to the unbecoming conduct of Mr. W. B. Chalkley, telegraph operator, on train No. 33, October 30th, between Stony Creek and Weldon, N. C.   This is in connection with our personal conversation this afternoon."

Sergeant Angle's letter reads:

"ATLANTIC COAST LINE RAILROAD COMPANY.
"Richmond, Va., October 31, 1923.
"MR. C. M. McELROY,
"Inspector of Police,
"Richmond, Virginia.
"Dear Sir:

"On train No. 33 to Weldon yesterday.   On arrival at Stony Creek I heard somebody hollering loud on the outside of the train: 'You don't know who you are shoving off the train, James.'   I then heard Conductor James then make a remark: 'If you don't shut your mouth up I will have you locked up.'

"I went outside the train to see what was the matter, and saw a man coming down the side of the train hollering loud to Mr. James about pushing him off the platform.   I asked Conductor James who the fellow was, and he said that he was an operator on the Richmond district by the name of W. B. Chalkley.

"When the train left Emporia I came out of the toilet and this man Chalkley and James were fussing loud claiming that James had hurt his arm.   I sat down by Mr. Chalkley and told him who I was, and asked him would he please stop talking loud in the train.   I smelled whiskey on Mr. Chalkley's breath.

"When I reached Weldon, Mr. Chalkley got off the train, and Agent Grant told me afterwards that Chalkley's breath nearly knocked him down while he was talking to him.

.        "Very truly yours,

"B. A. ANGLE,

"Sergeant of police."

When that report from Angle was received, Laird, the superintendent, wrote, addressing his letter to H. L. Grant, agent at Weldon (personal). His letter to Grant reads:

"I would like to have letter report from you with reference to condition of Operator Chalkley when he arrived at Weldon on train No. 33, October 30th. I understand you had conversation with Special Agent Angle regarding the matter."

To this Grant replied by letter dated Weldon, N. C., November 1, 1923:

"Referring to the attached with reference to condition of Operator Chalkley on the night of October 31st.

"I was on my way down town about 6:30 p. m. Mr. Chalkley was sitting down on the street stopped me to tell me what the conductor on No. 33 did to him requested me to report the conductor for him and at the same time asked me if I thought he was drunk. I told him I saw nothing that would indicate such and started to leave him, at this point he got up and came close to me then I detected strong odor of whiskey on him so offensive I left him before he was through talking to me."

The superintendent also received a report from Conductor W. H. James about the matter, which reads:

"ATLANTIC COAST LINE RAILROAD COMPANY.
        "Rocky Mount, N. C., November 1st, 1923.
"MR. E. P. LAIRD, Supt.,
    "Richmond, Va.
"Dear Sir:
    "Referring to conversation with Mr. H. E. Bruffey, T. M., today in regard to the conduct of W. B. Chalkley, operator at Drewry's Bluff, on train No. 33, October 30th, I wish to make the following statement:

    "About two (2) months ago this man got on No. 33 at Drewry's Bluff en route to Petersburg. When I went through train to collect the tickets he told me that he only had two cents to pay his fare with. He also said that he had an A. C. L. pay check for $4.70. I asked him to endorse it and he did and gave it to me. I gave him $4.05 in change and a cash fare receipt for sixty-five cents, Drewry's Bluff to Petersburg. He asked me not to cut him a cash fare receipt for same and seemed to get very angry because I did.

    "About six (6) weeks ago he boarded No. 33 at the same point, Drewry's Bluff, and told me that if I did not have a pass for him I would have to put him off. I stopped the train as I did not have the pass and told him to get down. He then said he had a pass to Petersburg and he gave it to me. He got off at Chester and sent Mr. McKay a message and I received a message at Petersburg to handle him to Jarratt. When he got off at Jarratt he said that he was going to report me. I told him to report anything he wanted to.

    "Again on October 30th, he got on No. 33 at Drewry's Bluff with a pass reading Richmond to Weldon. He asked me to mark him off at Petersburg, which I did. However, he did not get off at Peterbsurg, so I took his pass up. When approaching Stony Creek he was standing on platform steps at the front end of the white coach. I asked him to stand over on the colored coach, owing to the fact that I had a heavy casket for Stony

Creek and wanted to spot the baggage car. I also had several ladies to get off at that point. When I asked him to move he ignored me altogether and did not attempt to move. I then took him by the coat sleeve of his right arm and told him to get over on the other car. He then got over and said: 'If you put your hands on me again, I'll hit you.' He said this before Mrs. Collins and several other ladies. He then got off the train and went out to Operator Crowder who was standing beside the train. Mr. Crowder gave him a package and asked him to take to someone in Jarratt. He told Mr. Crowder he would take it over if the conductor would let him get off the train. I told him upon hearing this remark, that he could get off train at station as much as he pleased, just so he would keep off the steps and out of my way between stations. He then yelled out again: 'If you put your hands on me again, I'll hit you.' I told him to go ahead and shut up or I would have him locked up. He got back on the train and sat down. After we pulled out of Emporia, I went back through the train and he was holding his left arm and told me that I had hurt his arm. I told him that I had not touched his left arm at all and that I only took him by the right coat sleeve and asked him to stand out of my way. Flagman W. W. Campbell heard me tell him this the first time. Also Special Agent Angle was on train and can testify as to his conduct. Mr. Angle asked me if the man was drinking and I told him I could not say that he was. Mr. Angle and Flagman Campbell stated that they could smell something on his breath, but could not tell what it was.

"Hoping this information is what you desire, I am

"Yours truly,

"W. H. JAMES,

"Conductor."

Upon being asked what he did after receiving that report and letter, Superintendent Laird said:

"I sent the chief dispatcher, A. A. McKay, to Weldon to make an investigation and to take a statement from Mr. Chalkley. Mr. McKay reported to me that he had a conversation with Dr. Suiter, who examined Mr. Chalkley with reference to his statement of injury to his arm, and that Dr. Suiter had stated to him that Mr. Chalkley did not appear to him to be exactly normal; that he was either under the influence of liquor or of dope, and that he had found no external evidence of injury to the arm, but that as Mr. Chalkley had complained about a certain amount of pain in his arm, he had advised him to take some aspirin tablets, and that, if his arm was not better the next day, to return for further examination. Mr. McKay took a statement from Mr. Chalkley, from Mr. W. E. Hall, a yard helper, and several other statements from interested parties which Mr. Chalkley handed him while at Weldon in connection with this case."

This is the statement which was made by W. E. Hall, yard helper, Weldon, N. C.:

"I was at the passenger station on arrival of train No. 33, October 30th. Chalkley got off and asked me for Mr. Grant's 'phone number, or where he could locate him, said he had trouble with conductor on train No. 33 and wanted to report same.

"I walked with him up the street and was talking to him when we met Mr. Grant. He acted like a drunken man—talked foolish. I was sitting beside him and I got up so Mr. Grant could see the liquor was not on my breath instead of Chalkley's. I wanted him to know where the scent was coming from.

"He appeared to be drunk to me—not drunk, but under the influence of some stimulant. Could not

tell what he had had, but he had something.   If he had been drinking liquor, he had it hidden with something.   I could smell some odor on his breath, but I would not like to say that it was liquor.   This was somewhere in the neighborhood of 6:00 p. m.

"W. E. Hall,<br>"Yard Helper."

This is the statement from Chalkley which was obtained by McKay on the same occasion:

"Q. Mr. Chalkley, you were passenger on train No. 33, October 30, between Drewry's Bluff and Weldon?

"A. Yes, sir.

"Q. Tell me about the occurrence between you and Conductor James at Stony Creek and elsewhere.

"A. When I gave Conductor James my pass I told him I thought it possible I would stop off in Petersburg, but expected to ride through, and asked him to mark the pass off at Petersburg in case I did not do so.   This was the only conversation I had with him at all.   Did not speak to him on any other occasion until train was arriving at Stony Creek.   I was standing on the platform, holding onto grab iron, expecting to get off at Stony Creek to get a check due me there from Mr. Crowder.   As the train was about stopped, or just before it stopped, Conductor James caught hold of my left arm and gave it a violent twist and jerk, at the same time saying: 'I have told you a dozen times to keep out of the way.   I am going to have you locked up.'   After I got the check from Mr. Crowder I told Conductor James that if he put his hands on me again I would hit him.   He kept repeating that he would have me locked up.   I begged him to do so.   Operator Crowder asked me to deliver a package to the agent at Jarratt and I told him that I had been assaulted by the conductor and if I was allowed to do so I would

do it. I was sitting in the smoking car shortly afterward when Conductor James came through, and I told him that he hurt my arm—my left arm. He said that he had caught me by my right arm and that he was going to have me locked up. I told him I knew he had the authority and that I would not resist him, but that if he put his hands on me again I would hit him. He said ten or fifteen times he was going to have me locked up. After that I talked to one of the company's special officers. I had no more to say to Conductor James, came to Weldon, my left arm was paining me very badly, went to Dr. Suiter, had treatment, found Mr. Henry Grant and tried to have him make a report of the matter. Told him all the circumstances. Mr. Grant said that he could not report the matter as it would look too officious on his part. Mr. Grant told me the next morning that he either smelled whiskey on my breath or on my clothes, he was not sure which, whether on my breath, or whether on my clothes. In my conversation with Mr. Grant I asked him to please think carefully before he made any such statement as that, as I knew there was no whiskey about me, either on my breath or clothes, unless some one had sprinkled some on me, but I did not think that was possible.

"Q. Did you get off of the train at Stony Creek?

"A. Yes, sir; and went to Mr. Crowder to get my check.

"Q. Did you have anything to say to Conductor James while you were on the ground at Stony Creek?

"A. Yes, sir.

"Q. What did you say?

"A. That is not correct, I did not address my remark to Conductor James, I said to Operator Crowder that I would deliver that package at Jarratt if this conductor

would allow me to do so, that he had assaulted me and if he put his hands on me again that I would hit him.

"Q. Why were you so insistent that Conductor James should lock you up?

"A. Because he kept continuously threatening to do so before all of the passengers, and I did not want him to assault or injure me any more.

"Q. Did Conductor James push you off of the platform or pull you back up on the platform?

"A. Neither, he gave my left arm a violent twist and jerk, and I got upon the platform.

"Q. Did you have any words with Conductor James just after leaving Emporia?

"A. I do not remember whether it was just after leaving Emporia or not. I told him afterward that he had hurt my arm while train was en route from Stony Creek to Weldon. At some place I told him he had hurt my arm.

"Q. What treatment did Dr. Suiter give you?

"A. He examined my arm and told me not to use it any more than possible. He told me I could work at Weldon if I could pull levers with one arm; told me to take aspirin tablets, to use hot cloths and to keep my arm bandaged. He also told me that the leaders were strained.

"Q. Chalkley, had you had a drink that day?

"A. No, sir; not a drink. I got on No. 86, went to Richmond, came by dispatcher's office, got pass, went to South Richmond, bought groceries for home, went home at Drewry's Bluff, had dinner and came back just in time to catch No. 33, thinking that I would like to go to Weldon on No. 33 so that it would give me a good night's rest, as I had worked the night before, and wanted to be in condition to go to work the following morning.

"Q. Is there anything else you would like to say?

"A. No, sir.

"Q. Why did you not make report to me covering this?

"A. I did; I wrote you a letter the following day.

"Q. Have you a copy of the letter?

"A. I have a witness that I left it at the office in Weldon tower for mailing.    Mr. Merchant saw me place it there.    I reported it to you from Jarratt.    I got Ford to report it.    I tried to get Mr. Grant to report it. I wrote you a letter the next day."

At the same time there were also these exonerating statements produced by the plaintiff and delivered by McKay to Laird:

One from H. F. Taylor, operator Fa. Tower, Va., dated November 3, 1923, which reads: "I understand that Mr. W. B. Chalkley, employed as operator, is being held out of service on account of some trouble on 33 recently.    I beg to state that I have known Mr. Chalkley since we were children and I have never seen or known him to be under the influence of liquor or disorderly in any way.    So far as I know his services have been satisfactory and I sincerely hope you will allow him to continue in the service."

W. J. Crowder, operator at Stony Creek, Va., gave this statement, dated November 4th:    "This is to certify that on the evening of October 30, 1923, I had a pay check to deliver to Mr. W. B. Chalkley, operator, on train 33, which he was on and it was necessary for him to be out on the steps of the coach as it passed in order to get this check, but for some reason which I do not know he had to get off the train and run down to the baggage car in order to get this check and catch the car as it passed him."

W. H. Heist, operator at Weldon Yard, N. C., made a statement dated November 2, 1923, which reads: "This is my certificate to the fact that I met Mr. W. B. Chalkley, operator, on arrival of No. 33 at Petersburg, Va., October 30, 1923, and from observation and appearances he was strictly sober and not under the influence of stimulants at that time."

Mr. Paul E. Merchant and Mrs. R. H. Merchant, with whom Chalkley boarded in Weldon, signed this written statement: "Wish to state that I was in the presence of Mr. W. B. Chalkley on October 30th between 6:30 and 7:00 o'clock p. m., and had conversation with him. Could see nothing to lead me to think he was under the influence of whiskey and neither could I smell whiskey on his breath or clothes at the time stated above."

R. H. Krause signed a statement, dated Petersburg, November 2, 1923: "This is to say that the undersigned boarded No. 33 on October 30th at Drewry's Bluff, Virginia, in company with W. B. Chalkley and occupied the next seat to him Drewry's Bluff to Petersburg conversing with him on the way. I did not smell any liquor nor did he seem to be under the influence of liquor."

N. A. Palmore, agent at Drewry's Bluff, signed this statement: "This is to say that W. B. Chalkley boarded train No. 33 at this station October 30th, in company with R. H. Krause, en route to Weldon, N. C., and he was entirely sober as far as I am capable of judging. Mr. Chalkley lives near this place and I have always found him a person of orderly habits, interfering with no one."

With these letters and statements before him, the superintendent, in answer to a question as to what he next did, said: "I had a conference with W. B.

Darrow, superintendent of transportation, concerning this man, at which conference we decided that, for the good of the service and for the best interest of the company, as well as for the general benefit of the public, it would be best to relieve Operator Chalkley from the service. This was done, and I addressed a letter to Mr. McKay, the chief dispatcher, on November 9th, instructing him to dismiss Operator Chalkley from the service for violation of Rule G and improper conduct on passenger train."

He testified further that he had no animus or prejudice against Chalkley; that he was one man of many employed on the Richmond district in the transportation department—at that time about 550 men; that in Chalkley's particular class of service, telegraph operator, there were about forty men; that he had no reason to develop any personal animus or prejudice against Chalkley, and that all of his dealings with him had been strictly on matters of business. He said that he handled the Chalkley matter in the same way in which he handled all other cases of that character.

In answer to the question as to what induced him to direct Chalkley's dismissal from the service, he said: "Well, I felt that the interests of the company, and possible its welfare, as well as the particular duty that the railroad company owed to the public would be best served by removing Mr. Chalkley from the service. The position of telegraph operator, sir, is one of the most important that we have in the railroad service. He is the recipient of and the deliverer of messages and orders affecting the movement of trains, or, if stationed at posts where there are interlocking plants, the switch and signal levers are operated by him under instructions from the dispatcher, and that

requires a man of the caliber to measure up the most exacting in the service. The safety of the trains which are passing and their contents as well as the lives of the passengers, are dependent on the faithful performance of duty by the train dispatchers and the operators which transmit this information covering and governing the movement of trains; and, all things being considered, I thought it was best to remove Mr. Chalkley from the service."

In answer to the question: "How did you regard the statements and reports which were before you, as to Mr. Chalkley's condition and conduct on train No. 33 on October 30, 1923, upon which, as you have stated, you based your opinion as to the propriety of dismissing Mr. Chalkley from the service?" He said: "I had the utmost confidence in these statements, and honestly believed them to be true. I felt that Mr. Chalkley had weakened his own oral statements by his performance or conduct on the train on October 30th. The surrounding statements, many of them were in general and not applying to this specific occurrence, and others were given from such a distance that Mr. Chalkley's condition might not have been very carefully observed, and, weighing them with that thought in mind, I made the recommendation and carried out the discipline referred to." He later said that he placed particular dependence upon and confidence in the statement made by Agent Grant; that he had been one of the most reliable and sensible men in the service for many years and a man whom he always found to be absolutely truthful.

Upon being asked: "In what light would you have considered Mr. Chalkley's behavior on the train in relation to the conductor, even granting that the conductor himself might have been at fault?" He said:

"Well, Mr. Chalkley, as an employee of some years standing, knew that the conductor was in charge of the train. If the conductor had improperly handled him, or if the conductor had not given him all of the rights and privileges which were due him as a passenger and an employee-passenger, then he had a proper course of procedure, which, instead of trying to settle his differences personally with the conductor on the train, was to have reported it either to his employing office, the chief dispatcher, or to me, or to the train master. The conductor, of course, is subject to the same restrictions with reference to the application of rules and special instructions as are all other men in the employ of the company; and if the conductor had not done his part in carrying out his instructions on the train, he would have been equally liable to an investigation of his failure to perform his duties. Mr. Chalkley could have followed that course instead of personally trying to settle his differences by an agrument on the train, in which all of the passengers were very much interested and in which there was corresponding confusion."

There is much more of the same general trend, but nothing that weakens the cogency of the reasons given by the superintendent for the discharge. This, of course, presents a complete defense to the action, unless there be other evidence introduced for the plaintiff to indicate actual malice. The attorney for the plaintiff realizes this, and directs attention to this testimony of the plaintiff, upon which he relies to show such malice:

[7] (a) The plaintiff testified that about twelve or fifteen months before his dismissal and during a car inspectors' strike, Superintendent Laird asked him how he would like a job as car inspector, and that his

refusal did not seem to please Mr. Laird.   He was not, however, either discharged or suspended, nor was his record apparently affected by his refusal to accept the proffered employment.   The superintendent testifies that he does not remember the occurrence, but that they were then in need of men; that they were working continuously in their efforts to keep the traffic moving; and that if he made such a suggestion to Mr. Chalkley it was done in good faith, the car inspectors' wages being larger than those of the average telegraph operator.

(b) The plaintiff also testified that about seven or eight months before his dismissal, there was some delay in the Florida Special, a fast train, at Dunlop, in Chesterfield county, Virginia, while he was operator there, and that this delay was caused by a heavy freight train pulling out some drawheads.   Two or three days later he received a message that the train master objected to train No. 63 being stopped at Dunlop to let him off; that he went to see the chief train dispatcher about it and saw a letter or bulletin to the effect that the superintendent had just found out that train No. 63 was being stopped at Dunlop to take the operator on and off and that such must be immediately discontinued; that he did not know whether the superintendent ever investigated to ascertain whose fault it was that the Florida Special had been so delayed, but that he had seen a letter stating that it was his, the plaintiff's, fault; that he went to see the superintendent about the matter and in the course of conversation he told Laird that he knew he was not perfect, but that he certainly had not made any mistake on that occasion, and that Laird replied: "Don't make any more; mistakes cost too much."   He was not suspended, remained regularly in the employment of

the company, and his status was not changed as a result of that episode. Laird's account of that occurrence may be thus summarized: He said that he did not recollect that particular circumstance; that delays to trains caused by telegraph operators or some others in the service are frequent, and that it is customary to give a general admonition to those who are thought to be responsible for the delay; that he did not remember whether the plaintiff was operator at that point at the time in question or not; but if he said that he thought the operator at that point was responsible for the delay, that was his candid opinion at that time, and it would have been the same if it had been any other operator or any operator at any other place; that it was not pointed toward Mr. Chalkley individually, but was just one of those minor derelictions of duty which come under the jurisdiction of the superintendent to observe and correct. He said he did not remember whether he told Chalkley not to make any more mistakes, that mistakes were expensive, but that if he did it was simply a general admonition which he had frequently made to many other employees, and that there had been no ill feeling on his part against the plaintiff prior to the date of his discharge or since.

(c) The plaintiff also testified that seven or eight months prior to his dismissal he was hurt at Dunlop, and received $170.00 from the company. The following questions and answers appear in this connection:

"Q. Did Mr. Laird have anything to say to you about that?

"A. I had something to say to Mr. Laird about it.

"Q. What did you say?

"A. I told him I had heard that he had said that he did not know where they got such operators from; that there was Chalkley who got a little lick on the arm and they had to give him $170.00.

"Q. Did he deny it?

"A. No, sir; he did not deny it, or affirm it. I told him if he would look into the case with me, and if I was not entitled to it, I would give it back to him; and he said it belonged to the company and did not belong to him."

Plaintiff also testified that his relations with the company were not affected by this incident. Upon this point the superintendent testifies that he has no recollection of any such conversation, or of making any such statement; that he had nothing whatever to do with the settlement, which was not made through the transportation department but through the legal department; that there are a good many personal injuries for which the men are compensated and continue in the service, and the fact that the plaintiff continued in the service after he was so compensated for a personal injury is evidence of the fact that there was no prejudice or ill feeling against him; and that he was not conscious of any prejudice or anything of that sort against the plaintiff on account of that occurrence.

These are the three episodes occurring before the letter of dismissal, which the plaintiff claims shows ill will or malice on the part of Laird towards him personally. This testimony is entirely inadequate to support the contention that the qualified privilege was abused. The language used in the order of dismissal is temperate, and there is no extrinsic evidence of malice; indeed, no evidence whatever, intrinsic or extrinsic, which would have justified a jury in concluding that malice in fact existed. The charge which had been made by Inspector of Police McElroy and by Sergeant Angle of the police department had been carefully investigated and the result of that inquiry led to the discharge of the plaintiff. The discharge was com-

municated in restrained and decorous language, and the case is bare of any testimony to support the charge of malice; so that the presumption that the communication and discharge were made in good faith must prevail.   The plaintiff has failed to carry the burden which rested upon him to show the existence of malice or of any abuse of the privilege.

The weight of the evidence submitted to the superintendent supports his conclusion, but that is not the question which we have to consider, because whether this is true or not, if reached and acted on in good faith, no action will lie therefor.   We cannot and should not revise or supervise such discharges upon mere allegations of malice, unsupported by any evidence tending to establish malice.   It would be a public calamity if courts and juries, after the fact, were to substitute their judgment for the judgment of a railroad company's officials who are charged with the responsibilities of operation.   If the plaintiff had not been discharged after the occurrence of his altercation with the conductor on the train, attributed by eyewitnesses to his intoxication, and an accident had shortly thereafter occurred which was attributed to some omission or negligence on his part as a telegraph operator, this failure to discharge him would have been held by all courts and juries to be proof as strong as Holy Writ of the negligence of the company in retraining him in its employment, and ample to support a recovery for any injury to any person, or damage to any property, which could be attributed to his negligence or omission.

[8] There was no error, therefore, in sustaining the demurrer to the evidence because the plaintiff failed to show any malice, or abuse of the privilege.

[9] Another of the grounds of demurrer to the evidence is thus stated:

"3. That the evidence shows that there was no such publication as is required by law of the letter complained of in the declaration."

This presents an interesting and important question, which has never been raised directly in this State, and has led to differences of opinion in other jurisdictions.

There is a *dictum* by Cardwell, J., in *Sun Life Ins. Co.* v. *Bailey*, 101 Va. 445, 44 S. E. 692, which assumes that dictation to a stenographer constitutes a sufficient publication of an alleged libel. It should be borne in mind, however, that this was not said where there was a demurrer to the evidence, but in overruling a demurrer to a declaration which clearly and distinctly alleged the publication in general terms—that is, that the defendant had published and caused the alleged libel to be published, without stating the method of such publication. Of course, that demurrer to the declaration was properly overruled. This *dictum* cannot be construed as deciding the question which is here raised by demurrer to the specific evidence relied on to prove this publication.

There is an interesting note to *Globe Furniture Co.* v. *Wright* (49 App. D. C. 315, 265 Fed. 873), 18 A. L. R. 778. The cases *pro* and *con* are there cited, and it is shown that in many cases the modern and more liberal rule is applied, *i. e.*, that where the communication of the libelous matter to the plaintiff is in the customary and usual course of the business of the defendant, in the discharge of an ordinary business duty, and is merely dictated to a stenographer, or copyist, who is charged with the duty of transcribing it, this is not such a publication of the alleged libel as will support an action.

In *Lawless* v. *Anglo-Egyptian Cotton & Oil Co.* (1869), Law Rep. 4 Q. B. (Eng.) 262, 10 Best & S. 266, 38 Law J. Q. B., N. S., 129, 17 Week. Rep. 498, it is held that the mere delivery of a report of the directors of a stock company to a printer to make copies for distribution among stockholders, which contained a libelous reference to the company's manager, was not such a publication as prevented the communication from being privileged, it not appearing that the directors had departed from the usual course employed in distributing such information, which it was their duty to furnish the stockholders.

[10] In *Boxsius* v. *Goblet Freres* (1894), 1 Q. B. (Eng.) 842, 62 Law J. Q. B., N. S., 401, 9 Reports 224, 70 Law T., N. S., 368, 42 Week. Rep. 392, 58 J. P. 670, the court applied the rule that libelous matter is privileged when dictated to a stenographer in the discharge of an ordinary business duty. There a solicitor dictated to his stenographer a letter containing libelous statements, which letter was also copied into a letter book by another clerk. It was held that since the client himself would have been privileged in sending the letter direct, the privilege extended to the solicitor, he having been directed to send it. The court distinguished the case of *Pullman* v. *Hill* (1891), 1 Q. B. 524, 60 Law J. Q. B., N. S., 299, 64 Law T., N. S., 691, 39 Week. Rep. 263, on the ground that it was not in the ordinary business of a merchant to write the defamatory matter complained of in that case. The rule in *Pullman* v. *Hill*, *supra*, was again limited in *Edmondson* v. *Birch & Co.* (1907), 1 K. B. (Eng.) 371, 1 B. R. C. 444, 7 Ann. Cas. 192, and the rule of privilege extended to dictation and delivery of defamatory matter for copying, where the duty is only one of imperfect obligation, and not absolute, as in the

*Boxsius Case.* Applying this rule, it was there held that where business communications containing defamatory statements were dictated to a stenographer, and copied in a copy letter book by another clerk on a privileged occasion, the privileged occasion covered such a publication, so that the statements were not actionable. This is said by Collins, M. R., as to the *Pullman* and the *Boxsius Cases:* "The result of the two cases to which I have alluded, taken together, appears to me to be that where there is a duty, whether of perfect or imperfect obligation, as between two persons, which forms the ground of a privileged occasion, the person exercising the privilege is entitled to take all reasonable means of so doing, and there reasonable means may include the introduction of third persons, where that is reasonable and in the ordinary course of business, and if so, it will not destroy the privilege. In the case of a solicitor, his duty in conducting the business of his client may be absolute, whereas in this case it may be said that the duty was only one of imperfect obligation; but the nature of the obligation which gives rise to the privilege cannot, I think, alter its effect in this respect. If the duty is such as to give rise to a privileged occasion, then the fact that it is only one of imperfect obligation cannot affect the mode in which the privilege may reasonably be exercised." Cozens-Hardy, L. J., concurring, added, this: "I think that, if we were to accede to the argument for the plaintiff, we should in effect be destroying the defense of privilege in cases of this kind, in which limited companies and large mercantile firms are concerned, for it would be idle in such cases to suppose that such documents as those here complained of could, as a matter of business, be written by, and pass through the hands of, one partner or person only.

In the ordinary course of business, such a document must be copied and find its way into the copy letter book or telegram book of the company or firm.   The authorities appear to me to show that the privilege is not lost, so long as the occasion is used in a reasonable manner and in the ordinary course of business." Fletcher Moulton, L. J., succinctly added: "I agree. In my opinion the law on the subject, as laid down in the cases, amounts to this:   If a business communication is privileged, as being made on a privileged occasion, the privilege covers all the incidents of transmission and treatment of that communication which are in accordance with reason and the usual course of business."

In *Morgan* v. *Wallis* (1917), 33 Times Law Rep. (Eng.) 495, where, in holding that the mere dictation by a solicitor to a typist, as a matter of office routine, of a bill of costs, in which he inserted, without malice, defamatory matter which was relevant and reasonably necessary for the information of the person to whom the bill was sent, was not actionable, it is said:   "I think that this doctrine of publication of a libel by putting the thing before a typist verges on the absurd. *  *  Publication of a libel may be a criminal offense for which a man may receive a very heavy sentence, and to say that submitting a draft to a typist, who will simply rattle it over on a typewriter, hardly comprehending what the thing says, is a publication which may involve a man in a criminal charge, is to my mind verging on the absurd.   I do not say that it is absurd, because other judges have said that it is a publication, but I think that in the past the rule has been several times too widely stated, and that the court of appeal in the case of *Boxsius* v. *Goblet Freres, supra*, and other cases, has been that, and has limited

it by such decisions as in that case and the other cases which Mr. Lewis Thomas mentioned; and that really there must be something much more substantial than publication to a typist in order to constitute publication—something much more substantial than is to be found in the mere fact that a business man, a solicitor, employs a typist to make out his bills of costs. It might easily be that a man who had written a libel and desired to make it known to somebody would put it before a typist, merely in order that somebody should see it. In that case it would be intentional publication; but, where it is done as a mere matter of routine, I cannot see that it is publication."

In *Harper* v. *Hamilton Retail Grocers' Asso.* (1900), 37 Can. L. J. 31, 32 Ont. Rep. 295, where the secretary of a grocers' association gave the alleged libelous matter; which apparently related to the defendant's business, to a typist not in the regular employment of the defendants, but occasionally employed and paid by the secretary, to copy, it was held that there was no such publication to the typist as would render the association liable for libel.

In *Cartwright-Caps Co.* v. *Fischel* (1917), 113 Miss. 359, 74 So. 278, L. R. A. 1918F, 566, Ann. Cas. 1917E, 985, it was held that the dictation of a libelous letter by the president of a corporation to its stenographer, in the course of its business, did not constitute a publication of the libel, in the absence of any repetition by the stenographer to other persons; and in this connection it is said: "We think that the letters were privileged, and that there was not, in a legal sense, a publication of the letters in question. The appellant in this case is a corporation, and, of course, can act only through agents, and the acts both of the president and

the stenographer to whom the letter was dictated are the acts of the corporation. In our opinion, under the present conditions, the dictation of a letter to a stenographer, when employed by the person or corporation as a stenographer in the business, is not a sufficient publication, in the absence of any repetition by the person or stenographer to other persons."

[11] Perhaps the case most often cited and relied on for this view—the sound view as we think—is *Owen* v. *J. S. Ogilvie Pub. Co.* (1898), 32 App. Div. 465, 53 N. Y. Supp. 1033, 6 N. Y. Ann. Cas. 76. The court there laid down the rule that the dictation by the manager of a corporation to a stenographer of the firm, of a libelous letter concerning firm business, does not constitute a publication of the letter. There the fact that the manager and the stenographer were servants of a common master, engaged in their respective employments, was emphasized; and the case was regarded as distinct from one where the person giving the dictation and the stenographer bore the relation of master and servant, rather than co-employees of a common master, for it was said: "It may be that the dictation to the stenographer, and the reading of the letter, would constitute a publication of the same by the person dictating it, if the relation existing between the manager and the copyist was that of master and servant, and the letter be held not to be privileged. Such, however, was not the relation of these persons. They were both employed by a common master, and were engaged in the performance of duties which their respective employments required. Under such circumstances we do not think that the stenographer is to be regarded as a third person, in the sense that either the dictation or the subsequent reading can be regarded as a publication by the corporation. It was

a part of the manager's duty to write letters for the corporation, and it was the duty of the stenographer to take such letter in shorthand, copy it out, and read it for the purpose of correction. The manager could not write and publish a libel alone, and we think he could not charge the corporation with the consequences of this act, where the corporation, in the ordinary conduct of its business, required the action of the manager and the stenographer in the usual course of conducting its correspondence. The act of both was joint, for the corporation cannot be said to have completed the act which it required by the single act of the manager, as the act of both servants was necessary to make the thing complete. The writing and the copying were but parts of one act, *i. e.*, the production of the letter. Under such conditions we think the dictation, copying and mailing are to be treated as only one act of the corporation; and, as the two servants were required to participate in it, there was no publication of the letter, in the sense in which that term is understood, by delivering to and reading by a third person. There was in fact but one act by the corporation, and those engaged in the performance of it are not to be regarded as third parties, but as common servants engaged in the act."

This is followed in *Central of Georgia R. Co.* v. *Jones* (1916), 18 Ga. App. 414, 89 S. E. 429, where it was held that the dictation by an officer of a corporation to his stenographer, in the prosecution of its business, of a libelous letter, does not constitute a publication, since in such a case the stenographer cannot be regarded as a third person for the purpose of publication.

The facts in the case of *Prins* v. *Holland-North American Mortgage Co.*, 107 Wash. 206, 181 Pac. 680, 5 A. L. R. 451, were that a corporation of the Kingdom

of the Netherlands, having its principal office at Goringchem, mailed a letter containing the alleged libelous matter from its home office to its branch office at Seattle, Washington. It was received at the branch office in due course of mail, was read by a bookkeeper and by Wabeke, who was co-manager of the Seattle office with the plaintiff, Prins, and they both understood the foreign language in which it was written. It was alleged that the letter was libelous in that, by innuendo, it charged that the plaintiff, Prins, had been guilty of neglect of duty, want of capacity and breach of trust. It was held that such a communication from the home office to the branch office of the corporation for the attention of the employees located there was not a publication within the law of libel, and enforced the accepted rule that it is not a publication of a libel for one to write and mail a libelous letter to the person libeled.

The case of *Gambrill* v. *Schooley* (1901), 95 Md. 48, 48 Atl. 730, 52 L. R. A. 87, 86 Am. St. Rep. 414, is generally cited as the leading case enforcing the contrary view. We think, however, that this quotation from the opinion distinguishes that case from this: "We were referred to *Boxsius* v. *Goblet Freres* (1894), 1 Q. B. D. 843, as evincing a disposition to qualify the rule in *Pullman* v. *Hill* (1891), 1 Q. B. D. 529, but we cannot discover such disposition, and if we could, we should not be inclined to follow it. There the libelous letter was dictated by a solicitor, acting in behalf of and at the direction of his client, and copies were made as in the case mentioned. The court distinguished the case very clearly from *Pullman* v. *Hill* (1891), 1 Q. B. D. 529, holding, through two of the same judges, that the solicitor owed to his client the duty to act on his instructions, and that if the solicitor

had communicated directly with the plaintiff, the communication would have been privileged, and that he could discharge that duty, as he did other business of the office, in the ordinary way without losing the privilege. But there was no question of privilege in *Pullman* v. *Hill* (1891), 1 Q. B. D. 529, and there is none here, as the appellant owed no duty in the matter to anyone. The typewriter had no conceivable interest in hearing or seeing the letters, and there could be therefore no privilege between her and the appellant."

It appears then that in *Gambrill* v. *Schooley* there was no privilege; that the matter communicated was libelous *per se;* and that the stenographer had no duty whatever to perform in connection with the communication. Here, however, the communication was privileged and the typist had a duty to discharge in the ordinary course of business in connection with the transcription of the communication.

[12, 13] These cases and the conclusions which are indicated in the quotations which we have made appear to us to state the sound rule and its qualification. Of course, it is not intended to say that such a rule could be invoked for the protection of those who use it as a mere subterfuge where the libelous matter is in fact communicated to one who has no duty to perform in connection therewith, or is otherwise actually disseminated. It should, however, we think, be applied to a case like this, where the facts are undisputed and all that was done by the defendant's agents was to dictate the order of dismissal in appropriate language, in the usual course of business, and communicate it through the customary channels to the employee. Certainly, if a master, in the usual course of his business, merely dismisses his employee when he has a right to dismiss him, and uses temperate language for

the purpose and communicates it in writing to the employee, but to no one else, this is not a publication which will support such an action. So far as we perceive, this is in effect all that the defendant here has done. Being a corporation, it could only speak through its agents. The discharge of the plaintiff was a single act in which only two parties participated, one the Atlantic Coast Line Railroad Company, employer, speaking through Laird, superintendent, and the other the plaintiff, Chalkley, employee. The communication is therefore held to be a communication from the company directly to the employee, and there is no evidence showing any publication of the alleged libelous matter by the employer, or its agents, and hence there is no basis for the action.

Upon both of the grounds indicated, the demurrer to the plaintiff's evidence was properly sustained.

*Affirmed.*