MAGNOLIA PETROLEUM CO. et al.
v. DAVIDSON.

No. 31081. April 18, 1944.

*148 P. 2d 468.*

Robert W. Richards and B. B. Blakeney, Jr., both of Oklahoma City, and Tom Wallace, of Sapulpa, for plaintiffs in error.

Kermit Nash and Charles E. Webster, both of Drumright, for defendant in error.

CORN, C. J. This action was commenced in the superior court of Creek county, Okla., by Sherman G. Davidson, against Magnolia Petroleum Company and two of its employees, Pat D. Blackburn and Elmer White, to recover damages for slander and libel. The jury returned a verdict for the plaintiff in the sum of $6,500, and the court rendered judgment accordingly.

It is alleged by the plaintiff in his petition that Pat D. Blackburn, acting as employee and agent of and for Magnolia Petroleum Company, a corporation, and in the performance of his duties as such employee and agent, did, in several different conversations with, and in the presence and hearing of certain persons, maliciously speak, publish, and circulate of and concerning plaintiff certain slanderous, false, malicious, scandalous, and defamatory words, to-wit:

"He is guilty of making un–American utterances.

"We are afraid that if we don't fire him he will blow up something.

"The F.B.I. are after him and forced us to fire him."

The alleged slanderous words spoken by Elmer White were as follows:

"Davidson was fired because we were afraid he would blow something up.

"The F.B.I. had him fired."

It was also alleged that the defendant Magnolia Petroleum Company was guilty of libel in filing with the Unemployment Compensation and Placement Division of the Oklahoma State Department of Labor the "Separation Notice," which contained the statement that plaintiff was discharged by said company because of "unpatriotic remarks."

In answer thereto, each of the defendants filed a separate answer, White and Blackburn answering substantially the same by general denial and further alleging that if any publication was made, it was privileged, and that if defamatory words were spoken, they were true. The Magnolia Petroleum Company answered by general denial, but admitted that Blackburn and White were its employees during the time mentioned; that the plaintiff had been an employee of said corporation for a number of years prior to his discharge on January 5, 1942; that it filed the separation notice mentioned, but that it was required by the laws of the State of Oklahoma and was privileged. Said company specifically denied that it had, acting through its codefendants, or otherwise, made the statements set forth in plaintiff's petition, or that there was publication as alleged. It further alleged that if the slanderous words were spoken or published, it was on a privileged occasion, and that said statements, if spoken or published, were true.

The plaintiff replied separately to the separate answer of each of the defendants, denying in effect all allegations set forth in each answer.

The libel charge growing out of the "Separation Notice" aforesaid was ruled out by the trial court as a privileged communication, and no appeal therefrom was taken by the plaintiff, and it is not involved in this appeal.

The parties are referred to herein as plaintiff and defendants, respectively, as they appeared in the trial court.

It is first contended that the trial court erred in overruling the defendants' separate demurrers to the plaintiff's evidence.

The record discloses that Pat D. Blackburn was district superintendent of the gasoline department of the Magnolia Petroleum Company, with headquarters at Drumright, and Elmer White was foreman of the gasoline plant near the town of Oilton.

On January 3, 1942, Blackburn heard a rumor on the streets of Oilton relating to trouble between employees at the plant originating in arguments pertaining to the war. The next day he went out to the plant and asked Mr. White, plant foreman, to make an investigation and report the facts to him.

The investigation disclosed that a serious argument had occurred between the plaintiff and E. H. Whiteside, both employees at the plant, which aroused ill feelings between the two, and almost resulting in a fight on the job.

Blackburn interviewed several employees who had personal knowledge of the incident and who had heard the plaintiff make remarks of a partisan nature in regard to the European conflict over a period of several months before we were attacked by the Axis powers. Having completed the investigation, Blackburn discharged the plaintiff from his employment with the company. This action was taken on January 5, 1942.

Blackburn took sworn statements from employees of the company who had heard such statements made by plaintiff from time to time and mailed these affidavits to the office of the com-

pany at Dallas, Tex., and mailed copies to the F.B.I. at Oklahoma City.

The plaintiff admitted that he had made remarks and statements on many occasions that could be misconstrued as unpatriotic, but that he did not mean them as such, and had no intention of injuring the government when he made them. He contends that they were misconstrued, and the construction placed upon them by his employer as "unpatriotic remarks" was unjustified and defamatory. But whether said remarks were made, or if made, were misconstrued, we think is immaterial to the determination of this case, for, under the record herein, same was not published within the meaning of the law.

Fellow employees who had heard his remarks at different times expressing his attitude toward the international situation and the war were called as witnesses at the trial and testified concerning the remarks they had heard him make. The pertinent testimony was as follows:

E. H. Whiteside testified that on December 31, 1941, "I came into the boiler house telling about the news I had heard. Having a boy on the ocean, naturally I was interested in what the Japs were doing, and I was listening good, and I went in telling the boys, and I told them also that Hitler had promised his people complete victory this coming year. That, of course, was still 1941. And I said 'The commentator said that old Hitler forgot to say that he promised them the same thing for the last year.' When I said that, Mr. Davidson said 'Hurrah for Adolph!,' and he laughed. I said, 'Red, don't let me hear you say that again,' and when I told him that the third time — I don't remember the exact conversation between times and I won't undertake to state it — when I told him that the third time, he got mad and said: 'I will say it again if I want to and as many times as I want to,' and I said 'Not in front of me,' and that ended the conversation."

George F. Bales and Truman Bryan were present and heard these remarks, and testified to the same at the trial.

Whiteside further testified: "Well, when the Graff Spae was in Montevideo, or whatever name it is, he made the remark on Sunday out there to me, and I don't remember if anybody else heard it or not, that he hoped it would come out with guns blazing and sink the British warships waiting for her."

He also testified that Blackburn, when he investigated the matter, told him: "Well, he told me that he didn't want to make it hard on anybody and that he didn't want any gossip whatever. It seemed like he was sorry the thing came up."

George F. Bales testified, in addition to the "Hurrah for Adolph" incident, that "One time he said out there he didn't care if Germany took all them countries over there and Great Britain with them."

Truman Bryan testified: "He told me one time, or more than one time, that he wished that Hitler would take the European countries and come on over here and take the United States." He also corroborated the "Hurrah for Adolph" testimony of the other witnesses.

Claude Mitchell testified: ". . . during the time when the Graff Spae was in that neutral port, he told me that he hoped it sunk the British destroyers." "I never heard him say anything good about the democracies."

Henry Alred testified that he heard the remark about the Graff Spae. Also "He said that he hoped John L. Lewis would unionize the army and have them strike for seven dollars a day."

John L. Wilson testified: "Well, it was along about the time of the battle of Crete over there. . . . He said he hoped that they taken England and came on over here to the United States. . . . Well, I heard him say that he wished John L. Lewis would unionize the army."

George Brocksieck was called as a witness for the plaintiff. He was also an employee at the plant, but declined to sign a statement in the investigation.

He did not witness the clash between Davidson and Whiteside, but heard about it and tried to get Davidson to apologize and clear up the matter. It developed on cross-examination that Brocksieck, about a year and a half prior to that time, also had had a similar difficulty with Davidson over remarks made by Davidson during the invasion of France by the Germans.

The foregoing testimony was brought out by the defendants as a justification of the characterization by Blackburn of plaintiff's remarks as "un-American" and "unpatriotic." This is the background out of which the plaintiff's alleged cause of action grew, and we have given this outline in order to give a better understanding of the issues involved.

The record has been carefully examined to determine the sufficiency of the plaintiff's proof of the allegations in his petition. The plaintiff testified that Blackburn called him into the office and told him that he was going to pay him off; that he was discharging him for un-American utterances, and that was all he said. He did not testify as to any of the alleged statements, but relied entirely upon the testimony of George Brocksieck to the effect that he had a conversation with Elmer White a few days after plaintiff was discharged in which White implied that plaintiff was discharged because the F.B.I. was after him. Brocksieck also testified that White said that Blackburn told him he was afraid to leave plaintiff at the plant because he was afraid he would hurt somebody or somebody would hurt him. This is all the proof that plaintiff produced to support the allegations of his petition in regard to the alleged defamatory statements attributed to either Blackburn or White, or in regard to the alleged publication thereof.

Authorities are cited by the defendants to show that the statements made were privileged and were made under circumstances that did not constitute a publication.

In the case of Prins v. Holland-North American Mortgage Co., 107 Wash. 206, 181 P. 680, 5 A. L. R. 451, an allegedly libelous letter was sent from the home office in Holland to the branch office in Seattle, Wash., and there read by one of the comanagers and the bookkeeper, the plaintiff being the other comanager. The court, basing its decision upon the ground that there was no publication, said:

"Publication of a libel is the communication of the defamatory matter to some third person or persons. Here the communication was sent from the main office of the company to its branch office. Until the appellant himself spread the letter broadcast to the world, it does not appear from the complaint that it was exhibited to anyone other than the officers and employees of the respondent company, whose very duties in the conduct of the ordinary business of the company brought them in contact with it. Agents and employees of this character are not third persons in their relations to the corporation, within the meaning of the laws pertaining to the publication of libels. For the time being, they are a part and parcel of the corporation itself, so much so, indeed, that their acts within the limits of their employment are the acts of the corporation. For a corporation, therefore, acting through one of its agents or representatives, to send a libelous communication to another of its agents or representatives, cannot be a publication of the libel on the part of the corporation. It is but communicating with itself. The corporation can act only through officers and agents, and the officers and agents authorized to act for it are as much a part of the corporation at one place as at another, and the receipt or perusal of the letter by the corporation officers and agents at Seattle was as much the act of the corporation as was the writing of the letter by an officer or agent at the place of origin of the letter."

An identical situation was involved in McKenna v. Mansfield Leland Hotel Co., 55 Ohio App. 163, 9 N. E. 2d 166, where the manager of a hotel, in the presence of the kitchen supervisor, charged a kitchen employee of larceny. The court held there was no such publication of the slanderous charge as to make it publication.

A similar conclusion was reached in the following decisions: Flynn v. Reinke et al., 199 Wis. 124, 225 N. W. 742; Central of Georgia Ry. Co. v. Jones, 18 Ga. App. 414, 89 S. E. 429; George v. Georgia Power Co., 43 Ga. App. 596, 159 S. E. 756; Biggs v. Atlantic Coast Line R. Co. (C. C. A. Fifth) 66 Fed. 2d 87. A related line of decisions involving dictating a libelous letter to a secretary, or directing a subordinate employee to insert libelous words in a form, hold that such is not publication.

The defendants also discuss in their briefs the rule of qualified privilege, and assert that if the conversation between Brocksieck and Elmer White, his immediate superior as plant foreman, contained any statements of a defamatory nature by White, and if such statements to Brocksieck constituted a publication, then it was privileged under the qualified privilege rule.

We do not see any necessity of applying the qualified privilege rule to the conversation between Brocksieck and White, for the reason that, under the facts and circumstances, the statements of White to Brocksieck could not be considered as a matter of law a publication. Brocksieck himself was an employee of the company and had a duty to perform in connection with the investigation of the cause of the trouble at the plant where he worked, and that duty was to aid the managing and supervising officers or employees in the discharge of their duty to restore order and harmony among the employees at the plant. Apparently he performed that duty. He told Blackburn and White what he knew about the matter under investigation. He did not sign a statement for personal reasons. The conversation he had with White was private and was about a matter in which he had an interest as an employee of the company.

The defendants also moved for a directed verdict in their favor, but the motion was denied and the cause submitted to the jury under the instructions of the court.

Many other questions are presented in this appeal, including objections to the instructions, but under our view of the case it is not necessary to discuss them. We hold that under the evidence in the record there was no publication shown, and as a matter of law there was nothing to submit to the jury.

The judgment is reversed, with directions to dismiss the case.

GIBSON, V.C.J., and OSBORN, BAYLESS, HURST, DAVISON, and ARNOLD, JJ., concur.