Randall L. ANSON, Appellant,

v.

ERLANGER MINERALS AND METALS, INC., a New York corporation, d/b/a Erlanger Tubular Works, Joe Lucia, and Tony Michela, Appellees.

No. 62525.

Court of Appeals of Oklahoma, Division No. 4.

June 11, 1985.

Released for Publication by Order of Court of Appeals July 11, 1985.

---

**5.** *Knapp v. State Industrial Commission,* 195 Okla. 56, 154 P.2d 964 (1944).

Steven R. Hickman, Frasier & Frasier, Tulsa, for appellant.

J. Douglas Mann, Fred J. Hegenbart, Rosenstein, Fist & Ringold, Tulsa, for appellees.

BRIGHTMIRE, Presiding Judge.

Did the trial court err in granting summary judgments to three of the four defendants named by plaintiff, Randall L. Anson, in his action to recover for slanderous statements alleged to have been published by defendants Erlanger Minerals and Metals, Inc., John Partezana, Joe Lucia, and Tony Michela?

We hold it did and vacate them.

I

The operative facts which form the foundation for plaintiff's action include these. Anson was employed by Erlanger from June 1981 until about July 7, 1982, as a controller. His immediate supervisor was defendant Lucia, vice president and general manager of Erlanger.

One chilly day in February 1982, plaintiff and Lucia were riding around the city of Tulsa in an automobile when suddenly they came upon a private club called Shadow Mountain Racquet Club. After being told it was a recreation facility, Lucia, using some rather coarse street language, instructed Anson to join it. He did so. In fact he also bought memberships for five other top level managers at the direction of Lucia.

Eventually Lucia fired Anson. Later, while talking to an employment agency concerning a replacement for him, Lucia gratuitously discussed plaintiff.

"I told them," testified Lucia, "exactly what I have told you: That he is a difficult person, he is a very strong person, and we talked about the unauthorized use or unauthorized use of the Shadow Mountain issue ... That he joined a club and was not authorized to do that; that I am the only person in the plant with that authorization."

And, continued Lucia, with regard to the subject of plaintiff's unauthorized use of funds, "It was a behavior problem.... I am not sure that we used the words 'funds.' I don't think in terms of funds. He joined the club unauthorized."

There is other evidence that Lucia had accused Anson of "playing fast and loose with company funds" and in particular had "indicat[ed] that he [Anson] had stolen [a] membership from the company."

Defendant Michela admitted telling others that Anson had used company funds to make an unauthorized purchase of a club membership for himself. And, according to the record, defendant Partezana went about publishing that plaintiff was "fired for dipping into the company's till" and that he did so by making up "fictitious payroll checks ... to fictitious companies and used the money himself."

It is not denied that the Lucia and Michela statements were made in the course of Erlanger business. All the statements

were false, malicious and defamatory, said plaintiff, and they injured his name, reputation and standing in the community, held him up to public contempt, created hatred of him and generated ridicule among his peers. He estimated his damages to be $300,000 and he sought a like amount for punishment.

■ Defendants answered with a general denial and a statement that none of them had ever "accused the plaintiff of stealing company money," but only that he had made unauthorized use of company funds to purchase a membership for himself in a private club and that such publications were made in good faith in the course of running company business to parties having a "common and corresponding interest and duty"—apparently an attempt to plead a type of privilege as a defense.[1]

A few months later, after several depositions had been taken, defendants moved for a summary judgment saying that extensive discovery disclosed no material factual dispute existed and that the facts entitled them to a judgment. The motion was sustained in part and three defendants were granted judgment based on the conclusion that "[t]he communications made by the defendants ... are not reasonably capable of conveying the meaning ascribed to them by the plaintiff and the actual reasonable meaning of such communications [is] not defamatory as a matter of law."

Plaintiff appeals this ruling contending that he has pleaded an actionable defamation claim against all defendants and that the contents of the record disclose the existence of unresolved issues of material facts.

## II

■ It is not necessary to discuss the background of our current defamation law in detail. It will suffice to mention that the high court of this state has decisionally aligned our libel and slander law with the constitutional perceptions of the United States Supreme Court.[2] *Martin v. Griffin Television, Inc.,* 549 P.2d 85 (Okl.1976). The liability imposed by *Martin* on one publishing a defamatory falsehood about another is that delineated in 76 O.S.1981 § 5(a), namely, that one is liable for willfully making such a publication as well as for doing so without using the ordinary care a prudent person would use to ascertain its falsity. As applied to the news media, for instance, ordinary care is said in *Martin* to consist of "that degree of care which ordinarily prudent persons engaged in the same kind of business usually exercise under similar circumstances."

■ Hence the constitutionally required fault elements underlying liability for defamation in this state are willfulness and negligence. More specifically, liability attaches to anyone who publishes a defamatory falsehood concerning a private person—or a public official or figure regarding a purely private matter not affecting his official conduct, fitness or capacity—if (1) the utterer knows the statement is false, or (2) the publisher acts in reckless disregard of whether such statement is false or not, or (3) the speaker acts negligently in failing to ascertain that the statement is false.[3]

And finally, what is slanderous defamation in this state? It is defined by statute as a false oral communication which, so far as is relevant in this case, (1) "[c]harges any person with crime," or (2) "[t]ends directly to injure [one] in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office

---

1. An untrue and unfair statement, however, is not privileged. *Bodine v. Times-Journal Pub. Co.,* 26 Okl. 135, 110 P. 1096 (1910).

2. Standards of liability for defamatory falsehoods injurious to private persons were left for the states to define so long as liability without fault was not imposed. *Gertz v. Robert Welch,*

*Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974).

3. Such elements of a cause of action for defamatory falsehood are similar to those stated in the Restatement (Second) of Torts §§ 558 and 580B (1977).

or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade or business that has a natural tendency to lessen its profit," or (3) "[w]hich, by natural consequences, causes actual damage." 12 O.S. 1981 § 1442.

### III

So then the issue arising from the foregoing facts and law is this: Can it be said as a matter of law that the admitted publications of the defendants were not defamatory falsehoods?

Defendants say it can. They invite our attention to the Restatement (Second) of Torts § 614 (1977), which discusses the function of the court and the jury. That section states that the court determines "(a) whether a communication is capable of bearing [or conveying] a particular meaning [or innuendo]" ascribed to it by plaintiff, "and (b) whether that meaning is defamatory," while the jury determines "whether a communication, capable of a defamatory meaning, was so understood by its recipient."

The defendants' argument is that even though they did tell people they fired Anson and that he used company funds to buy a private club membership for himself and five other employees without authority, such a charge does not "indicate or suggest" Anson was a "thief" or impute to him the commission of a crime, i.e., embezzlement or fraudulent conversion of company assets, nor does it "suggest or imply dishonesty." In short they say neither the words nor the circumstances surrounding their utterance will reasonably permit a defamatory understanding on the part of a listener.

█ This argument is not persuasive. In the first place it is not necessary to use the words "steal," "thief" or even imply a criminal act for a statement to be defamatory. As we have seen, any false statement that tends to be injurious to one's profession, business or occupation is slander. Here, the record discloses the existence of both direct and circumstantial evidence indicating the message received by certain identified listeners was a derogatory one, one that imputed to plaintiff some degrading malfeasance in office, and one that implied he was guilty of a serious unlawful act. Indeed one affiant said Lucia's statement that Anson had been playing fast and loose with company funds indicated to him that plaintiff "had been stealing from the company."

█ Accusing a corporate controller of the unauthorized use of corporate funds to purchase a private club membership for himself must be understood to mean the officer is at most an embezzler and at least incompetent to properly perform the role of controlling company expenditures. Which of these the listener perceives upon receiving the admitted communication depends on a number of circumstances including, for instance, the publisher's tone of voice, his facial expressions, other body language and the like. The most that can be said for the defense position is that while the charge of unauthorized expenditure of company funds may or may not refer to an act accompanied by criminal intent, the fact is that such a statement can imply embezzlement and dishonesty under certain circumstances, and under others, job-related malfeasance—implications that directly tend to injure one with respect to his profession, trade or business.

The problem facing defendants is to convincingly show defensively that (1) the admitted accusation neither imputed criminal conduct to plaintiff nor imparted the idea that the plaintiff was an untrustworthy, incompetent or careless controller, and (2) the accusation was not understood in either sense by the listener. Considering the fact that a controller is an official whose main job is to keep track of, preserve, and protect company assets from waste and unauthorized disbursement, defendants may find their task a bit difficult. Frankly, we think most people would conclude, if told a company official was fired because he bought himself a membership in a private club with company funds without authori-

ty, that the official committed a serious dishonest act.

■ Finally, we should comment on defendant Lucia's contention that his staff meeting. remarks are not publications. Without deciding whether they were or not we think they are admissibly relevant to the issue of malice and related counter-contention that his publications were in good faith, innocent and intended to be harmless. As we mentioned earlier, an affiant who attended a staff meeting took Lucia's statement that plaintiff "had been playing fast and loose with company funds," to mean that plaintiff "had been stealing from the company."[4] The testimony of another staff member who attended the same meeting was that the basis for Lucia's accusation was an "unauthorized use of company funds" by plaintiff to purchase "an unauthorized club membership." This sheds light on how Lucia viewed plaintiff's conduct, what motivated the other publications and what he meant to convey to his listeners, all of which in turn provides an important clue as to the meaning of the statements made.

■ We hold, therefore, that the publications complained of are capable of conveying a defamatory meaning and that several fact questions exist for jury resolution.

## IV

Among the material issues of fact reflected by the record at this stage of the proceedings are these.

First is the question of whether the assailed publications were made and if so were they false.

Second are the questions of whether the publications probably conveyed a defamatory meaning to the recipient and whether the latter probably understood that meaning.

Third. If the publications are found to be false, there are the issues of willfulness and actual malice, or, perhaps negligence in the case of some defendants. Parenthetically, if the facts are found to be that the unauthorized club membership purchase charge is false and that Lucia ordered the purchasing then seemingly Lucia's publication will have to be found to have been willful.

Fourth, the amount of damage to be awarded to plaintiff.

## V

■ It is well to be reminded of an astute observation the court made in *Weaver v. Pryor Jeffersonian*: "[S]ummary judgment is a lethal weapon and courts must be mindful of its aims and targets and beware of overkill."[5] To this we add that great care should be taken to avoid improperly denying a plaintiff his day in court. For, after all, courts exist primarily for plaintiffs.[6]

The summary judgment granted Erlanger Minerals and Metal, Inc., Joe Lucia and Tony Michela is vacated and the cause is remanded for further proceedings.

RAPP and STUBBLEFIELD, JJ., concur.

---

4. Assuming this assertion is not a publication under *Magnolia Petroleum Co. v. Davidson*, 194 Okl. 115, 148 P.2d 468 (1944), it does not follow that it is not an admissible circumstance shedding light on the intended meaning of Lucia's publications, his ill will and his motive.

5. 569 P.2d 967, 974 (Okl.1977). This was borrowed from *Brunswick Corp. v. Vineberg*, 370 F.2d 605 (5th Cir.1967). The *Brunswick* court made two further observations in vacating a summary judgment that should also be kept in mind:

"That we now can correct its misguided application here is no answer. This case now has been in suspended animation for a year and a half, and it tellingly mocks the 'just, speedy, and inexpensive determination of every action' envisioned by Rule 1 of the Federal Rules of Civil Procedure.

. . . .

... 'A party opposing summary judgment need not come forward in any way if the moving party has not supported his motion to the point of showing that the issue is sham. The amendment introduces no change here.' " *Id.* at 612 (citations omitted).

6. *Pettis v. Johnston*, 78 Okl. 277, 190 P. 681 (1920).