**David FRANKSON, Respondent,**

v.

**DESIGN SPACE INTERNATIONAL, et al., Appellants.**

**No. C5-85-708.**

Court of Appeals of Minnesota.

Jan. 21, 1986.

Certification Granted Feb. 19, 1986.

tract, and unpaid salary and commissions. DSI counterclaimed, alleging that Frankson breached covenants not to compete and not to divulge trade secrets and claiming Frankson engaged in unfair competition and deceptive trade practices.

At the close of the evidence at trial, the judge directed a verdict for Frankson on all counterclaims. The trial court jury found that Frankson was employed at will and that DSI did not breach employment agreements in determining Frankson's compensation or terminating his employment. However, the jury found that Frankson was entitled to receive $28,196.27 for the reasonable value of his services in excess of salary and commissions already paid.

The jury also found that statements contained in Frankson's termination letter were untrue and made with actual malice. The jury awarded $70,000 in damages resulting from the defamation and an additional $125,000 in punitive damages.

DSI appeals from the judgment based on the jury's verdict and from the trial court's directed verdict on DSI's counterclaims. We affirm. For reasons noted in our opinion, we certify the case to the supreme court.

### FACTS

Frankson began working for DSI in 1974. DSI sells and leases modular units and trailers for use as offices and living quarters, primarily for on-site construction projects. Frankson's employment was governed by a series of written contracts. These contracts were for the term of employment and one year thereafter; Frankson and other employees typically signed new contracts only when given pay raises or duty changes. The contract of the parties in effect when DSI terminated Frankson in November 1980 was dated February 1, 1980.

When Frankson signed the February 1980 contract, he was moving into the job of Major Projects Manager, but he retained the title of Branch Sales Manager. DSI had not yet found a replacement for him in

Wellington H. Law, Christopher S. Hayhoe, Paul C. Wolf, Edina, for respondent.

Allen I. Saeks, James V. Roth, Minneapolis, for appellants.

Heard, considered and decided by the court en banc consisting of POPOVICH, C.J., and PARKER, FOLEY, WOZNIAK, LANSING, HUSPENI and CRIPPEN, JJ.

### OPINION

CRIPPEN, Judge.

Respondent David Frankson, an employee of appellant Design Space International (DSI) since 1974, was discharged by DSI on November 17, 1980. Frankson subsequently sued appellant for defamation, termination in breach of an employment con-

the Branch Sales Manager position. The contract states Frankson was both Branch Sales Manager and Major Projects Sales Representative.

In addition to his salary, Frankson earned sales commissions. The terms governing commissions were contained in a separate document entitled "Compensation Plan" and are not set out in the employment agreement of February 1980. The Compensation Plans were revised annually. They contained the following clause:

The maximum cumulative commission payable for one or more contracts with one customer, during the fiscal year, shall not exceed $5,000.

In September 1979, Frankson signed a statement indicating that he had reviewed and accepted his latest Compensation Plan. However, Frankson typed in his own exception to the Plan and requested that DSI's president acknowledge the exception by signing and returning the document. The exception was a waiver of the $5000 limit noted above. DSI's president, Ray Wooldridge, never signed or returned the document.

The job of Major Projects Manager was a promotion for Frankson. The Major Projects program was aimed at larger sales and lease contracts, specifically those exceeding $100,000 or those involving in excess of 25 units per year. It also included federal government contracts and contracts involving exportation of units outside the United States. Frankson was concerned about the limit on his commissions per customer because a major project typically involved only one customer but could include several large contracts and could require most of his time. Frankson testified that he signed the 1979 Plan because at the time he was not yet into the Major Projects program. Anticipating his advancement, he added the exception requesting the waiver of the $5000 limit.

Frankson discussed the issue with his supervisor, company Vice President William Lindelow, who reassured him that a new Compensation Plan for major projects would have a much higher limit or no limit at all.

In May 1980, a new employment agreement and a Compensation Plan for Major Projects was distributed to Frankson. The Compensation Plan contained no limit on commissions earned. However, that Plan never took effect because two days after Frankson received it he was directed to return the new documents unsigned. Apparently, the Compensation Plan had gone out prior to approval by DSI's president.

Frankson received a revised Compensation Plan on July 31, 1980. This Plan was to cover August 1, 1980 through July 31, 1981. The Plan contained a $10,000 limit on commissions earned through sales to a single customer. Frankson signed the Plan on August 6, 1980.

Frankson was unhappy about the $10,000 limit on commissions and again talked to Lindelow about it. Frankson had been working on a major project with a customer named Montana Power and had sold $2,319,627 in contracts to them during the six months before he received the Compensation Plan containing the $10,000 limit. He had not consummated many other contracts during this period, so he was concerned about receiving "full" commissions on his sales to Montana Power. Lindelow testified he cautioned Frankson "many times" about putting all his efforts into the Montana Power project and that Wooldridge would decide the amount of commission that Frankson would be paid.

Lindelow advised Frankson to prepare a memo showing his sales made to Montana Power and the commissions payable on those sales. When Lindelow received the memo in late August 1980, he wrote "OK to pay" on it, signed it, and forwarded it to Ray Wooldridge. Wooldridge did not agree to pay the full commission, which totaled $28,196.27.

The DSI compensation committee discussed the commission dispute and proposed to pay Frankson $10,000, $5000 more than the limit DSI proposed for Frankson's September 1979 Compensation Plan. Major Projects sales personnel had in the past

operated under compensation plans that differed from the standard plan and Frankson had been in Major Projects full time since early 1980. Frankson refused to accept the $10,000 when it was tendered to him.

On November 17, 1980, Lindelow and DSI's personnel manager, Edward Burns, went to Frankson's office and presented him with a letter of termination. The letter gave the reason for discharge as "failure to increase business as a Major Projects Sales Representative." The letter was dictated by Burns, typed by his secretary, placed in Frankson's personnel file, and also distributed to Lindelow and Wooldridge. Frankson then brought suit against DSI.

At trial, Frankson presented quarterly sales performance statistics showing that he was first among Major Projects Managers in September 1980. He presented evidence that had his sales figures been included in the quarterly figures for the quarter ending in October 1980, he would have again been first, with sales of 71,120 square feet. The second place person sold only 15,532 square feet. As of September 1980, Frankson also showed that he was first in sales for 1980 through September, and that he had an outstanding sales record when he was Branch Sales Manager.

Besides evidence of his past sales achievements, Frankson presented evidence of the sales projects he worked on in 1980. He submitted a list of 10 projects he was working on in February 1980. He listed four other projects that he worked on in the summer of 1980. He testified that he attended sales conventions and trade shows to get leads for potential sales.

DSI presented some testimony to refute Frankson's evidence about his performance record. Lindelow testified that Frankson's sales for the third quarter of 1980 were all from the large Montana Power contract. He stated that the Montana Power transaction had actually taken place five months before the sales figures were released, so the figures did not reflect Frankson's performance in the months immediately before his termination. He testified that in the fiscal year beginning September 1980, Frankson had no sales.

After leaving DSI, Frankson did not look for another sales job, but he started his own business in early 1981. The business, called Space Mobile and Modular Structures, is similar in nature to DSI. Their size and financial bases are, however, dissimilar. Frankson, who started with $5000, has not earned a profit in his business. He operates the business out of his home.

DSI is owned by Gelco, a multi-national firm, and it is a division of Transport International Pool, Inc., which had $173 million in sales in 1984. DSI alone had $40 million in sales in 1984.

Appellant claims that by starting this company within a year of his termination, Frankson violated the non-compete clause in his contract with them. DSI also claims that Frankson's use of the word "SPACE" constitutes unfair competition. In addition, appellant claims that Frankson made use of confidential information in violation of a covenant not to divulge trade secrets and that Frankson engaged in deceptive trade practices. DSI did not produce evidence of damages, lost sales, use of trade secrets, or deceptive trade practices.

## ISSUES

1. Was the defamatory statement published?

2. Was there sufficient evidence of malice to overcome the qualified privilege?

3. Was there sufficient evidence to support the jury's award of $70,000 in damages resulting from defamation?

4. Was there sufficient evidence to support the jury's award of $125,000 in punitive damages?

5. Did the trial court err in its evidentiary rulings?

6. Did the trial court err in directing a verdict for Frankson on DSI's counterclaims?

## ANALYSIS

■ 1. The elements of a common law defamation action are well settled. In order for DSI's statement to be defamatory (1) it must have been communicated to someone other than Frankson, (2) it must be false, and (3) it must tend to harm Frankson's reputation and to lower him in the estimation of the community. *See Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 255 (Minn.1980). Since the defamation affected Frankson in his business, trade, profession, office or calling, it constitutes defamation per se, satisfying the third element, and is actionable without any proof of actual damages. *See id.*

DSI does not challenge the jury's decision that its statement about Frankson was untrue and does not dispute the trial judge's conclusion that the statement was defamatory per se. It contends, however, that Frankson failed to show that the statement was published or communicated such as to make the defamation actionable. DSI argues that "in-house" publication, particularly where limited to the personnel director, his secretary, and DSI's president and vice-president, does not constitute publication for defamation purposes.

■ An in-house communication of a defamatory statement is a publication. *Hebner v. Great Northern Railway Co.,* 78 Minn. 289, 290–91, 80 N.W. 1128, 1128 (1899). In *Hebner,* the plaintiff had been discharged by defendant and went to his ex-employer to get a copy of his service record. When the plaintiff arrived at the defendant's office, the book containing these records was brought into the office and a clerk read the reason for plaintiff's discharge in the presence of another clerk, the defendant, and the plaintiff. The trial court held that this was sufficient publication. *Id. See also McKenzie v. Burns International Detective Agency, Inc.,* 149 Minn. 311, 183 N.W. 516 (1921). In *McKenzie,* a defamatory statement was found by implication to be published when the only listeners were the plaintiff and his ex-employer's manager. Publication was not questioned or discussed by the supreme court in the course of its opinion on the issue of whether the statement was protected by privilege. *Id.* at 312–13, 183 N.W.2d at 516–17. Other cases since *McKenzie* have followed the method of analysis used there. *See, e.g., McBride v. Sears, Roebuck & Co.,* 306 Minn. 93, 96–97, 235 N.W.2d 371, 374 (1975) (communications between employer's agents made in the course of investigating or punishing employee misconduct, when made upon a proper occasion and for a proper purpose, are privileged).

Not all jurisdictions agree that in-house communications such as occurred in this case constitute publication. *See* Annot., 62 A.L.R.3d 1207, 1218–21 (1975). The Minnesota rule, however, is the more prevalent position, and it enjoys important additional support. Restatement (Second) of Torts says in part:

> The dictation of a defamatory letter to a stenographer who takes shorthand notes is itself a publication of a libel by the person dictating the letter even though the notes are never transcribed nor read by the stenographer or any other person.

Restatement (Second) of Torts § 577 comment h (1977). In addition, Professor Prosser writes:

> There may be publication to any third person. It may be made to * * * the defendant's own agent, employee or officer, even where the defendant is a corporation. The dictation of defamatory matter to a stenographer generally is regarded as sufficient publication, although it may be privileged.

W. Prosser and W. Keeton, *Prosser and Keeton on the Law of Torts* § 113, at 798–99 (5th ed. 1984) (citing, *inter alia, Pullman v. Walter Hill & Co.,* 1 Q.B. 524, 60 L.J.B. 209 (1891); *Rickbeil v. Grafton Deaconess Hospital,* 74 N.D. 525, 23 N.W.2d 247 (1946); *Ostrowe v. Lee,* 256 N.Y. 36, 175 N.E. 505 (1931); *Arvey Corp. v. Peterson,* 178 F.Supp. 132 (E.D.Pa 1959); *Gambrill v. Schooley,* 93 Md. 48, 48 A. 730 (1901); *Berry v. City of New York Ins. Co.,* 210 Ala. 369, 98 So. 290 (1923)).

The court in the *Rickbeil* case, where the only publication was dictation to a stenographer, stated the rule succinctly:

> Publication of defamatory matter is the communication of the same to a third person. * * * The action may be maintained even if published to one person only. * * * To publish is to intentionally exhibit the defamatory words to one other than the libelee. No words more definitely convey the idea requisite in law to support an action for writing defamatory words.

*Rickbeil,* 74 N.D. at 533, 23 N.W.2d at 251.

We conclude that the dictation of the defamatory letter by Burns to his secretary and the distribution of the letter to a personnel file and to two officers, Lindelow and Wooldridge, constituted publication of the defamatory statement.

■■■ 2. The defamatory statements were qualifiedly privileged. In the employment context, an employer has the privilege to describe the reason for an employee's discharge. *See Stuempges,* 297 N.W.2d at 257. However, the jury found that the statements were made with actual malice, a fact that defeats the privilege. *See id.* n. 4.

■■■ When reviewing jury verdicts, the appellate court's role is limited. Testimony is considered in the light most favorable to the prevailing party, and a verdict will only be disturbed if it is manifestly and palpably contrary to the evidence. Where, as here, the jury must consider the demeanor of the witnesses, review is even more limited. *Id.* at 256 (cites omitted).

The Minnesota Supreme Court, citing *McKenzie,* has held that common law malice is established by proving "ill will or improper motive" toward a plaintiff. *Jadwin v. Minneapolis Star & Tribune Co.,* 367 N.W.2d 476, 481 n.5 (Minn.1985). In the present case, the trial court gave the jury lengthy instructions on the identification of malice. The trial judge described malice in several different ways, including knowledge of falsity, reckless disregard of truth or falsity, bad faith with intent to injure, ill will and improper motive, and willful, wanton and reckless disregard of Frankson's rights and interests.

■■■ Portions of the trial judge's instructions are an overstatement of the applicable standard, since knowledge of falsity and reckless disregard of the truth or falsity need only be shown to overcome the First Amendment publication privilege. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). The overstatement indicates that the jury found evidence of a greater degree of malice than needed to show that fact for purposes of respondent's claim.

■■■ We conclude the evidence here was sufficient to sustain the jury's verdict on malice. The jury heard extensive direct evidence on respondent's job performance and on the dispute regarding his compensation. It heard ample evidence that DSI's statement about Frankson was false, and DSI has not appealed on the sufficiency of proof for a jury finding on that fact. The testimony is adequate to support inferences that DSI officials chose in bad faith to hurt Frankson when they documented and preserved the false statement that Frankson did not produce sales.

DSI argues that the failure of Frankson to show any communication outside DSI compels the conclusion that there was no bad faith, no intent to injure, and no improper motive. We cannot agree. To define malice as a matter of law solely by distinguishing among different forms of actionable publication is tantamount to a mandate for proof that publication is actually injurious, a proposition in direct conflict with the primary concept that business defamation is actionable per se, without the sometimes impossible demonstration of actual damage. *See Stuempges,* 297 N.W.2d at 255.

■■■ 3. Because the statements made by DSI were defamatory per se as defamations of Frankson's business reputation, general damages are presumed. *See Stuempges,* 297 N.W.2d at 259. The appel-

late courts tend to leave the amount to be awarded to the jury's discretion. *Id.* In this case, Frankson chose not to pursue sales employment elsewhere, but instead opened his own business. He testified that he knew he would not be hired by any company because DSI's stated reason for terminating him was his failure to increase business. It was for the jury to assess the weight and credibility of this testimony. Moreover, the jury received an instruction on Frankson's duty to mitigate damages, which would operate to lessen their award to Frankson because he in fact did not seek other employment. The jury nevertheless chose to believe Frankson's assessment of his earning prospects and awarded $70,000.

Appellant points to cases where publication was much more extensive or where evidence of actual pecuniary loss was much greater than in the present case, but damage awards were much smaller. In *Stuempges*, for example, where plaintiff proved a causal relationship between the defamation and his inability to find employment, the jury awarded only $17,250 in actual damages, $10,500 in compensatory damages, and $10,000 in punitive damages. 297 N.W.2d at 254.

We find appellant's argument that the damage award is excessive to be unconvincing. A wide range of damage awards is inevitable in varying fact situations considered by different juries. *Cf. Advanced Training Systems, Inc. v. Caswell Equipment Co.*, 352 N.W.2d 1, 11 (1984) (jury award of $75,000 in actual damages and $250,000 in punitive damages not excessive for libel). The jury's decision here was not manifestly or palpably contrary to the evidence so as to warrant disturbing the amount of the damage award.

4. The amount of punitive damages is a decision almost exclusively within the province of the jury. The standard for disturbing the award is that it must be so excessive as to be unreasonable. *Stuempges*, 297 N.W.2d at 259. Punitive damages are recoverable in cases of defamation per se without proof of actual damages. *Id.*

Minnesota statutes list several factors that measure punitive damage awards. *See* Minn.Stat. § 549.20, subd. 3 (1984). The trial court aptly summarized the factors to the jury as follows:

First, the seriousness of the hazard to the plaintiff arising from the defendant's publication of the defamatory statement.

Second, the profitability of the publication of the defamatory statement to the defendant.

Third, the duration of time involved in the publication of the defamatory statement.

Fourth, the degree of the defendant's awareness of the hazard in publishing the defamatory statement and its awareness of the excessiveness of such statement.

Fifth, the attitude of the defendant in regard to the publication of the defamatory statement.

Sixth, the number and level of employees involved in causing the publication of the defamatory statement.

And, finally, seventh, the financial condition of the defendant.

DSI is a profitable corporation owned by Gelco, an extremely large and profitable corporation. DSI's awareness of the excessiveness of its defamatory statement may also have influenced the jury. The disparity between the alleged reason for termination and Frankson's sales record, plus the questionable testimony at trial by Lindelow and Burns that the commission dispute was not even discussed at the meeting where they decided to terminate Frankson may have increased the jury's desire to punish the wrongdoer.

There was an absence of evidence showing that DSI intended to use the defamatory statement to keep Frankson from obtaining employment. However, the fact that DSI falsely documented an employee's record, and the fact that DSI would fire one of its top sales employees because he demanded performance on an oral agreement on commissions presents a sufficient case for punitive damages. Moreover, DSI's wealth shows that, unless the puni-

tive damages are high, they will not serve their deterrent purpose. The jury's award of punitive damages cannot be disturbed.

■ 5. Appellant alleges several evidentiary errors by the trial court. First, DSI contends that the trial court erred in excluding evidence regarding the eventual fruit of efforts started by Frankson but unfinished when he was discharged. Appellant contends this decision deprived the jury of evidence to rebut Frankson's evidence that he was a top sales employee. Counsel made no offer of proof about eventual fruitlessness of Frankson's sales efforts and it is apparent that this evidence had no bearing on the truth of DSI's discharge statement at the time it was made. DSI's counsel had a full opportunity to cross-examine Frankson about his successes and failures through the time he was discharged.

■ Second, DSI argues that because the evidence showed that Frankson admitted he knew Lindelow did not have the authority to negotiate the commission amounts with him, it was error to submit the question of Lindelow's apparent authority to the jury. Frankson's testimony is not as unambiguous as appellant asserts. In fact, Lindelow's own testimony about his authority and his representations to Frankson was also ambiguous.

■ Third, appellant claims that evidence concerning communications between Frankson and the DSI management regarding the terms and conditions of his employment was inadmissible parol evidence. In addition, the Frankson employment agreement says that the "foregoing contains the entire Agreement of the parties hereto, and no modification thereof shall be binding upon the parties unless such modification is in writing and signed by the parties hereto or unless otherwise provided herein." The evidence showed that DSI did not adhere to this paragraph.

■ The parol evidence rule only excludes evidence that is prior to or contemporaneous with a written contract. *See Ortendahl v. Bergmann,* 343 N.W.2d 309,

312 (Minn.Ct.App.1984). The communications that appellant questions occurred after Frankson was in DSI's employ and after he had signed more than one employment agreement. Further, the crucial discussions did not concern the terms of the employment agreement, but those of the Compensation Plan. Because the September 1979 Plan was never signed by both parties, and because of Frankson's continuing objection to the $5000 limit contained in that Plan, it is doubtful that any agreement existed to which the parol evidence rule may be applied. Finally, the terms of the August 1980 Plan that Frankson did sign and agree to are not at issue in this case.

■ Fourth, appellant contends that because Frankson's claim was predicated upon an express contract, there can be no recovery under a theory of quantum meruit. This agreement ignores the fact that Frankson's quantum meruit claim was submitted as an alternative to the breach of contract claim. Whether or not there was an agreement between Frankson and DSI regarding the amount of Frankson's commissions was a fact question decided by the jury. When the jury failed to find a breach of the contract, it properly turned to Frankson's equitable claim for the reasonable value of his services. *See Ritchel v. Remington,* 155 Minn. 154, 156, 193 N.W. 32, 33 (1923) (where full agreement as to compensation has not been made, the employee may recover the reasonable value of his services).

■ Fifth, appellant argues that it was error to admit the testimony of two other Major Projects Managers on the issue of the reasonable value of Frankson's services. The evidence was relevant because persons in similar positions within the organization are in the best position to know what value the company gives to the position. At trial, the court sustained DSI's objections to this testimony to the extent that it required further foundation to be established regarding the witnesses' personal knowledge of the information requested. The trial court correctly stated

that, with a proper foundation, the two were then entitled to give their opinion, and the jury would then give the testimony the credibility and weight that it felt was warranted.

6. DSI did not present any evidence to substantiate their counterclaims. The trial court properly directed a verdict for Frankson on these claims.

7. The application of defamation law to the facts here has important consequences. The issues here on publication and malice have not been specifically addressed by the supreme court, and it should review these questions. Moreover, the supreme court has pending before it the case of *Lewis v. Equitable Life Assurance Society,* 361 N.W.2d 875 (Minn.Ct.App.1985), *pet. for rev. granted* (Minn.1985), which also involves, *inter alia,* an issue on malice in a claim of an employer's defamation while discharging employees. For these reasons it is appropriate to certify the case for accelerated review by the supreme court. *See* Minn.Stat. § 480A.10, subd. 2(b) (1984).

## DECISION

The trial court did not err in its evidentiary rulings or in its directed verdict for Frankson on DSI's counterclaims. Appellant's distribution and filing of a false statement constituted publication for a lawful defamation claim. The jury's finding of malice and its damage awards were supported by the evidence.

Affirmed and certified.

FOLEY and HUSPENI, JJ., concur specially.

LANSING, J., concurs specially in part and dissents in part.

WOZNIAK, J., dissents.

## ORDER

### CERTIFICATION AND REQUEST

WHEREAS, the above-entitled appeal is now pending in this court; and

WHEREAS, this court has determined that certification of the matter to the supreme court for accelerated review pursuant to Minn.Stat. § 480A.10, subd. 2(b) (1984) is appropriate for the following reasons:

(1) The questions presented are important ones upon which the court has not, but should specifically rule,

(2) The Supreme Court has pending before it the case of *Lewis v. Equitable Life Assurance Society,* 361 N.W.2d 875 (Minn. Ct.App.1985), *pet. for rev. granted,* (Minn. March 29, 1985), which involves at least one issue presented by this case.

(3) The analysis contained in the attached opinion.

IT IS HEREBY REQUESTED that the supreme court approve the certification of this matter. Counsel for any party may file a response to this request with the Supreme Court Commissioner, 322 State Capitol, St. Paul, MN 55155 within ten days of the date of this document.

Dated January 14, 1986.

BY THE COURT<br>
Gary L. Crippen<br>
Presiding Judge

FOLEY, Judge (concurring specially).

I reluctantly concur in the result. There is still a lingering doubt in my mind that the language contained in the termination letter constituted actionable libel for which damages could be awarded.

Perhaps if the appellate court had the power to review the case *de novo* as held in *Bose v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), a different result would occur, particularly on the issue of actual malice, which is necessary to defeat a qualified privilege. *See Kloch v. Ratcliffe,* 221 Neb. 241, 248, 375 N.W.2d 916, 921 (1985). A recent Iowa case discusses qualified privilege and malice. *See Haldeman v. Total Petroleum, Inc.,* 376 N.W.2d 98 (Iowa 1985) (claim of libel denied where discharged employee rejected by prospective employer because of comments stating reason for discharge from previous employ-

ment). The evidence to establish malice is woefully weak in this case.

There were rulings on evidence which could very well have resulted in a new trial had a fuller record been made by way of an offer of proof concerning evidence of the area and projects worked on by Frankson that DSI wanted to use to refute Frankson's claim, especially on the elements of both falsity and malice. That evidence might have more fully explained DSI's actions in placing the comments it did about Frankson's work and sales accomplishments in the termination letter given to him. At this juncture, we can only speculate what that proof would have been.

The dissent makes a strong case for protecting intracorporate communications between those limited few within the corporation who are part of the process by which the letter of termination was produced. *See Mims v. Metropolitian Life Insurance Co.*, 200 F.2d 800, 803 (5th Cir.1952), *cert. denied*, 345 U.S. 940, 73 S.Ct. 831, 97 L.Ed. 1366 (1953); *see also Jones v. Golden Spike Corp.*, 97 Nev. 24, 26, 623 P.2d 970, 971 (1981) (adopts *Mims* rule); *Lee v. Brown*, 210 Kan. 168, 172, 499 P.2d 1076, 1080 (1972) (follows and applies *Mims*).

The letter terminating Frankson's employment never left the corporate files of DSI. The holding seems to be that dictating the letter to the secretary, who is an essential part of the process of termination of Frankson by the corporation, constituted publication. This is a case that should be carefully reviewed by the supreme court and particularly the court should review the *Hebner* and *McKenzie* cases relative to in-house publication.

In view of our limited scope of review under the present state of the law, we have no alternative but to affirm. In addition, there were seemingly inconsistent statements contained in the trial court's instructions relative to the burden of proof in this case, but since no claimed error is asserted with respect to the instructions, we cannot consider any error in that respect that may have occurred.

HUSPENI, Judge (concurring specially).

I join in the special concurrence of Judge Foley.

LANSING, Judge (concurring in part and dissenting in part).

I join in that portion of the majority opinion designated parts 1, 2, 5 and 6. DSI, apparently laboring under a belief that cause was required to terminate Frankson's employment, published statements about Frankson's job performance which the jury found to be knowingly false or inaccurate. From this the jury could properly find malice under the standard approved in *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 257–58 (Minn.1980).

However, I cannot join in affirming the compensatory and punitive damages in this case. The "presumed damage" rule, once extensively followed throughout the United States, has come under increasing challenge. *See Prosser and Keeton on the Law of Torts* § 112, at 795–97 (W. Keeton 5th ed. 1984); Restatement (Second) of Torts § 621 (1977). Our supreme court has recently applied the presumed damage rule in defamation of an individual's business reputation. *Stuempges*, 297 N.W.2d at 259. In affirming the award of presumed compensatory damages in *Stuempges*, the court specifically referred to the "devastating quality" of the defendant's remarks. DSI's publication was limited, and the statements do not possess the "devastating quality" of the remarks made by the employer in *Stuempges*.

Even more difficult to uphold is the jury's award of $125,000 in punitive damages. As applied solely to the defamatory conduct, very few of the seven factors formulated by the trial court support the award of punitive damages. In the absence of extensive publication or evidence that DSI intended to use the defamatory statements to keep Frankson from obtaining employment, the issue of punitive damages should not have gone to the jury. *See Hammersten v. Reiling*, 262 Minn. 200, 209, 115 N.W.2d 259, 266 (1962) (punitive

damages upheld for publication of article "designed to damage, if not destroy, plaintiff").

I would reverse the award of punitive damages and grant a new trial on the issue of compensatory damages.

WOZNIAK, Judge (dissenting).

I respectfully dissent.

We are initially confronted with the bizarre result of the jury finding that Frankson was employed at will, that there was no breach of his *written* employment contract, that he was *not wrongfully terminated* by DSI, and yet that he is entitled to $195,000 in general and punitive damages based solely on an internal termination letter which was shown only to those corporate employees within the chain of command who needed to know and without *any evidence* from Frankson of any damage.

1. The first element which a plaintiff must prove in a defamation action is that there was publication of the defamatory statement. *Olson v. Molland*, 181 Minn. 364, 232 N.W. 625 (1930). Publication is the communication of the defamatory matter to a third person or persons. *Stuempges v. Parke, Davis & Co.*, 297 N.W.2d 252, 255 (Minn.1980).

In the present case, Frankson's termination letter, containing the alleged defamatory statement, was seen by three other persons: the secretary who typed the letter, Frankson's supervisor, and the company president. The letter was not communicated to any other person within or outside the corporation. It was restricted to those within the corporation who had a "need to know."

Upon review of the relevant caselaw, I conclude that Minnesota law does not consider such restricted intra-corporate communication made within the chain of command on a need-to-know basis to be a publication.

The majority incorrectly cites *Hebner v. Great Northern Railway Co.*, 78 Minn. 289, 80 N.W. 1128 (1899), for the proposition that an in-house communication of a defamatory statement constitutes publication. In *Hebner*, the issue of publication was not appealed, and the court only assumed publication in order to decide the case on a privilege question:

[I]t is conceded on this appeal that the only question to be determined is whether the evidence adduced at the trial would have warranted the jury in finding that the defendant, when publishing these words of and concerning plaintiff, was actuated by malice, or did otherwise than a reasonably prudent man would have done under the same circumstances.

*Id.* at 291, 80 N.W. at 1128.

Subsequent to *Hebner*, however, the supreme court clarified the rule concerning such intra-corporate communication. In *Cleary v. Great Northern Railway Co.*, 147 Minn. 403, 180 N.W. 545 (1920), the plaintiff's supervisor at work directed the personnel office of the company to place a defamatory statement in plaintiff's personnel file. The entry in the file stated: "Relieved, on account unable to properly handle work assigned and men." Plaintiff then brought a defamation action against the company without the company ever having communicated the defamatory matter outside the company. In upholding the trial court, the Minnesota Supreme Court reasoned as follows:

[P]laintiff failed to adduce any proof to carry other essential issues to the jury. There was no testimony that any other [employer] had received information in respect to the record mentioned from this defendant. It must be conceded that defendant has the right to discharge plaintiff, even if no cause therefor existed. *It could also make a record for its own use as to the reason for the discharge. So long as this record was not furnished to others, or made use of to prevent plaintiff from securing work, it could not injure or damage plaintiff, though false. Plaintiff testified that he got the certificate of clearance from defendant, but he did not claim that he exhibited it to any one.* * * *. *There is an entire absence of proof that plain-*

*tiff was denied any work or place whatever, on account of the record made by defendant's employment bureau, or because of defendant's interference or statements.*

*Id.* at 405, 180 N.W. at 546 (emphasis supplied). While the court noted that "The instant case was not brought or tried as a libel suit, nor is the language of the clearance actionable per se," *id.* at 407, 180 N.W. at 547, the policies underlying the decision are identical to those which should be applied in this case. Contrary to the limited authorities relied upon by the majority, the more sensible and workable rule is that the preparation by a secretary of a termination letter (or file memorandum) dictated by the personnel manager, and its distribution only to the employee's supervisor and the company president, do not constitute "publication" for purposes of a defamation action.

Such a formulation of the publication requirement is not a license for the widespread communication of defamatory matter within a company. Rather, the role is limited to that communication which is made within the chain of command on a need-to-know basis. This appears to be the majority rule. *See Jones v. Golden Spike Corp.,* 97 Nev. 24, 623 P.2d 970 (1981); *see also Commercial Union Insurance Co. v. Melikyan,* 424 So.2d 1114 (La.Ct.App.1982); *Ellis v. Jewish Hospital of St. Louis,* 581 S.W.2d 850 (Mo.App.1979); *Jackson v. Douglas County Electric Membership Corp.,* 150 Ga.App. 523, 258 S.E.2d 152 (1979); *Burney v. Southern Railway Co.,* 276 Ala. 637, 165 So.2d 726 (1964); *Anderson v. Southern Railway Co.,* 224 S.C. 65, 77 S.E.2d 350 (1953); *Magnolia Petroleum Co. v. Davidson,* 194 Okl. 115, 148 P.2d 468 (1944); *Chalkley v. Atlantic Coast Line Railway Co.,* 150 Va. 301, 143 S.E. 631 (1928); *Prins v. Holland-North America Mortgage Co.,* 107 Wash. 206, 181 P. 680 (1919). In the present case, it is undisputed that the termination letter was communicated only to those employees of DSI who were within the chain of command on a need-to-know basis.

The majority decision makes a drastic extension of the law of defamation. Where the contents of a termination letter are communicated only to company employees, the critical issue in a defamation action is whether publication exists. To decide that dictation to a secretary and distribution to key employees of a corporation constitute publication is to undermine the reasons for the publication requirement. An intra-corporate communication, among agents of the same corporation and in relation to their duties for the corporation, is merely a communication of the corporation itself. The majority's position restricts the ability of a business to operate effectively. It inhibits the necessary flow of information between corporate employees. It discourages the documentation of ordinary performance reviews or disciplinary action. Upon dismissal or discipline of employees, employers might justifiably refuse to disclose the reasons for the action out of fear of defamation lawsuits. Such results can only be said to be detrimental to employees.

The majority's decision also extends our recent case of *Lewis v. Equitable Life Assurance Society of the United States,* 361 N.W.2d 875 (Minn.Ct.App.1985), *pet. for rev. granted* (Minn. March 29, 1985), itself an extension of existing law. While *Lewis* involved the self-publication of a defamatory statement to potential employers, our case is considerably narrower. Here, there is no claim of publication to any person outside the corporation. The argument presented by the dissent in *Lewis* applies with even greater force here: "The majority ruling recognizes, in thin disguise, the tort of wrongful termination rejected by our supreme court." *Id.* at 884.

If the majority position becomes law, it would virtually make every statement made by a supervisor or personnel manager in the employment context subject to jury scrutiny to determine whether a jury agrees with the reasons for the personnel action taken. This would overthrow the employment at will doctrine by subversion since virtually every decision could be chal-

lenged as defamatory and thus subject to being reviewed by a jury to determine if they agree with the reason given for the personnel action.

2. Even if the alleged defamatory statements are deemed, as the majority holds, to be published within the corporation as a matter of law, Frankson did not make the showing of actual malice necessary to defeat the qualified privilege protecting communications between employer and employee.

The jury *found* that a qualified privilege existed here. Once DSI had shown that the termination letter was qualifiedly privileged, the burden shifted to Frankson to prove that the privilege had been abused. See *Stuempges*, 297 N.W.2d at 257. To demonstrate malice, a plaintiff must prove that the defendant "made the statement from ill will and improper motives, or causelessly and wantonly *for the purpose of injuring the plaintiff.*" *Id.* at 257 (emphasis added) (quoting *McKenzie v. William J. Burns International Detective Agency, Inc.*, 149 Minn. 311, 312, 183 N.W. 516, 517 (1921)).

Here, the evidence presented by Frankson was totally insufficient to permit the malice issue to go to the jury. Frankson produced no direct evidence of actual malice. Rather, he produced evidence which tended to show the *falsity* of the statements made by DSI. Such evidence, however, does not by itself indicate that DSI intended "wantonly to injure" Frankson or demonstrate any "ill will" toward Frankson. DSI stated that Frankson was not doing his job adequately. Unlike the plaintiff in *Stuempges*, Frankson made no showing that he was threatened with being "blackballed" or given a poor recommendation. The jury concluded that DSI was entitled to terminate Frankson under the terms of his at will employment contract. The absence of any communication of the defamatory statements to persons outside DSI corroborates the conclusion that DSI did not act primarily out of ill will.

Further, as a matter of law there was no evidence of malice. The evidence is clear that representatives of DSI did not act from ill will or improper motives or causelessly or wantonly for the purpose of injuring plaintiff. The termination letter and the reasons for Frankson's termination were *never* discussed with outside parties by any representatives of DSI. DSI employees took no action to jeopardize plaintiff's search for new employment. The letter terminating his employment did *not* say that he was a bad salesman or that he was guilty of any misconduct. It merely stated that he had failed to increase business as a "major projects representative." This does not establish that defendants acted with malice in terminating him for his failure adequately to increase sales as a major products representative.

In allowing the malice issue to go to the jury, the trial court improperly permitted the jury to speculate as to possible ulterior motives of DSI. The trial court allowed the jury to second-guess DSI's business judgment regarding the termination and to decide that they disagreed as to the reason for Frankson's termination. Once again, it is clear that this claim for defamation is but a thinly veiled attempt to circumvent the supreme court's refusal to recognize a claim for wrongful discharge.

3. Finally, there is insufficient evidence to support either the jury's award of $70,000 in general damages or the award of $125,000 in punitive damages.

Because the words contained in the termination letter were actionable *per se*, Frankson was not required to prove actual damages. However, this fact does not relieve Frankson of the duty to present evidence of *some* damage. Professor Prosser writes:

> When there has been a publication of defamatory matter to the general public, it is rational to permit the jury to assume that there has been some harm to reputation, and substantial compensatory damages should be awarded as vindication of the plaintiff's good name. But it is not so obvious that any impairment to reputation will inevitably result from the publication of libel privately to one or more

persons who may or may not believe the statement to be true.

\* \* \* \* \* \*

It would seem, \* \* \*, that courts should require as a minimum for recovery in every case either evidence from which harm to reputation could reasonably be inferred or direct evidence of harm to reputation.

W.P. Keeton, D. Dobbs, R. Keeton & D. Owen, Prosser & Keeton on *The Law of Torts*, § 113, at 797 (5th ed. 1984). *See also* Restatement (Second) of Torts § 621 (1977).

Frankson presented no evidence whatsoever of any actual damage caused by the statement itself, as opposed to damage from the termination which the jury found to be proper and legal. He made no effort to contact other employers because he felt no one would hire a salesman who had been fired. Because no evidence of damages was presented, the jury could only speculate. Damage awards based on pure speculation and conjecture have never been tolerated by Minnesota courts. *See e.g. Hammersten v. Reiling*, 262 Minn. 200, 115 N.W.2d 259, *cert. denied*, 371 U.S. 862, 83 S.Ct. 120, 9 L.Ed.2d 100 (1962); *Hornblower & Weeks-Hemphill Noyes v. Lazere*, 301 Minn. 462, 467, 222 N.W.2d 799, 803 (1974). At most, assuming Frankson made out all other elements of his case, he is entitled to only nominal damages.

As to punitive damages, Minn.Stat. § 549.20 provides:

Punitive damages shall be allowed in civil actions only upon *clear and convincing evidence* that the acts of the defendant show a willful indifference to the rights or safety of others.

(Emphasis added.)

As stated above, Frankson failed to show by any evidence, let alone by clear and convincing evidence, that DSI acted with malice when its agents stated the reason for Frankson's termination. It bears repeating that the jury found that Frankson was properly terminated. The act of preparing a termination letter and discussing it with those employees who needed to know cannot constitute clear and convincing evidence of willful indifference to the rights of others.

By any rational standard, this jury's award of $195,000 of damages in a case in which the plaintiff did not show even $1.00 of damages is not only excessive, but shocking.

I would reverse the trial court.