**William JAMES and Darlene James, individually, and as next of kin of Devon James, deceased, Appellants,**

**v.**

**John O'NEAL and Shirley O'Neal, Appellees,**

**and**

**Eric Riley, Robert Wilkins and Roger Brocher, Defendants.**

**No. 74521.**

Court of Appeals of Oklahoma, Division No. 2.

April 21, 1992.

Rehearing Denied May 11, 1992.

Certiorari Denied Oct. 6, 1992.

Jack D. Crews, Ash, Crews & Reid, Tulsa, for appellants.

John A. Gladd, Gladd & Darrah, P.A., Tulsa, for appellees.

RAPP, Presiding Judge.

The plain facts are that two young adults went out on the town, drinking and riding in a motor vehicle. Devon James, who would die this night, was so intoxicated that he at one point, upon being left alone by Eric Riley while he went into a teen nightspot, got out of the vehicle and was later found lying in a ditch unconscious. Riley himself returned to the vehicle because he too was drunk and had been told to leave the teen nightspot. Riley placed James into the vehicle and started home with James asleep or passed out. Riley, while jockeying for position with another

vehicle, stopped by it at a stoplight. James, who had woken up, got out and walked to the other vehicle. Riley heard a "pop" above the radio. James went to one knee and the other vehicle drove away. Riley assisted James to the vehicle and, thinking there was a possibility of a shot, examined him briefly and found no blood or other evidence of a gunshot wound. He then chased the other vehicle as James did not apparently request medical aid or for that matter any aid. Failing to catch the other vehicle, he then drove to the house of his aunt and uncle, the defendants O'Neals.

John O'Neal met the boys at the door. Riley said his friend was drunk and requested that he be allowed to spend the night. Shirley O'Neal refused and called James' mother, the plaintiff, told the plaintiff her son had been drinking, was rowdy and acting up in her front yard and garage and told her to come and get him. The boy's mother agreed to do so but delayed in order to obtain help because her son was violent when drunk and she could not handle him. She did not tell the O'Neals she was going to delay her arrival or that she was going to obtain assistance. She delayed not only before leaving her house but also approximately thirty minutes at the house of a friend where she stopped to get assistance.

Meanwhile, Riley took James into the garage, quieted him down, took off his clothes except his shorts and covered him with a blanket, waiting for James' mother to arrive. Riley then went into the house and told the O'Neals of the car and that he had thought he heard a gunshot. He also stated he had examined his friend James for blood and a possible gunshot wound at the stoplight and also when he took his clothes off in the garage and found neither. Riley went to the garage and went to sleep beside James. When James' mother finally arrived she saw both boys on the garage floor on a blanket, one asleep and the other dead.

The police on professional examination located a small, apparently bloodless bullet wound under the waist band of James' boxer shorts.

On these facts the plaintiffs filed a lawsuit grounding their claim against the defendants in negligence. The trial court granted summary judgment in favor of the O'Neals, and the plaintiffs now appeal asserting as error that a genuine issue of fact existed as to whether the O'Neals breached a legal duty to the plaintiffs' son.

This appeal is fatally flawed for the simple reason that negligence requires a duty that was breached. The plaintiffs have failed to establish a duty owed them or the deceased.

The youth's friend had examined him after what he thought was possibly a gunshot and found nothing. Even after undressing him at the O'Neals' home to make him more comfortable so he could lie down in the garage and sleep off the alcohol, he again found no evidence of a wound. Riley quieted down from what for all purposes was a rowdy, known violent drunk he brought to the O'Neals' home to sleep off the effects of alcohol. They called the young man's parents to come and take care of their son. The plaintiff delayed because she knew she could not handle her son's violence by herself when he was drunk. The youth's mother, upon being requested to pick him up from the O'Neals' home, twice delayed prior to showing up at the O'Neals—once at her home approximately fifteen minutes and then an additional twenty-five minutes at her friend's house.

This then constitutes the plaintiffs' cause of "negligence." The plaintiffs have wholly failed to demonstrate a scintilla of duty beyond what the O'Neals thought they were undertaking—to give shelter to a drunken violent-prone youth pending the parents' delayed arrival. To support this alleged duty the plaintiffs cite a secondary source for a general principle that if one attempts to care for an injured person they are required to provide proper care. This too must fail for the simple reason there has been shown no undertaking of care other than to quiet and temporarily shelter a rowdy violent young drunk, suffering from an excess of alcohol, pending the expected eminent arrival of his parent. The plaintiffs' reliance on *Nye v. Cox*, 440 P.2d

683 (Okla.1968), is also misplaced. Here the deceased was drunk. It was not known that he was shot or injured. His actions—jumping around and being rowdy in the yard and garage—are not actions indicative of a fatal or even nonfatal gunshot wound. The plaintiffs here have failed to establish any knowledge of a gunshot wound or any assumption of care for an injured person other than as one handicapped by alcohol poisoning. Care appropriate to a drunk, violent young man was given. *Nye* requires the plaintiffs to establish the deceased's injury in whole or in part from the defendants' *negligence*, but prior to the negligence there *must* be a duty—which is here wholly missing. There is no such thing as negligence in the air. Neither the concept of duty or negligence may be grafted onto a set of facts to grow a tort. It is well established that negligence can only exist where there is a duty owed and breached. *See Nicholson v. Tacker*, 512 P.2d 156, 158 (Okla.1973). Here the plaintiffs wholly failed to establish even the remotest concept of duty owed the deceased.

The trial court's judgment was correct and should be affirmed.

STUBBLEFIELD, J. (sitting by designation), concurs specially.

BRIGHTMIRE, J., dissents.

STUBBLEFIELD, Judge (sitting by designation), concurring specially.

I concur, but write to reiterate the reasonableness of the actions of the O'Neals under the circumstances of this case. They did not know, as claims the dissenter, that "Devon had probably been shot." What the O'Neals were told was that Devon had earlier said that he had been shot. However, Devon was extremely intoxicated at that time and the O'Neals' son, Eric, had examined Devon at the scene of the shooting incident and again when making him comfortable in the O'Neals' garage, and had found no signs of any gunshot wound. *The evidence was that Eric assumed that Devon had not been shot but that he was*

*merely drunk.* When Eric told his parents the story of the night's happening (at around 1:00 a.m.), they went with him to the garage to check on Devon and also looked Devon over and could see no sign of any wound.

Unfortunately, Devon had been shot and had a small bloodless entry wound that was under the waist band of his boxer shorts. The wound went undiscovered, and Devon's behavior was attributed to his intoxication. The O'Neals had called Devon's mother and awaited her arrival. They had Eric lie down beside Devon to "keep him quiet" and because they "didn't want him to make an attempt to get up and fall." Unfortunately, the undiscovered and unknown wound proved fatal.

Although there was clearly a tragedy here, the facts certainly indicate that the O'Neals had no further duty to the young man. They afforded care and attention commensurate with what they reasonably believed were the facts, and no reasonable man could conclude that they owed some greater duty. Summary judgment was appropriate, and should be affirmed.

BRIGHTMIRE, Judge, dissenting.

I dissent from the court's decision because in my opinion unresolved issues of material fact exists as to whether the O'Neals were negligent in failing to exercise reasonable care for the protection of the helpless Devon after receiving information that he had been shot. I would reverse the summary judgment granted to the defendants and remand for trial.

I

The facts—developed mainly from the depositions of the defendants—viewed in a light most favorable to the plaintiffs, disclose the following events culminating in the tragic death of the plaintiffs' minor child.

On Saturday night, May 30, 1987, seventeen-year-old Devon James and his friend, Eric Riley,[1] decided to go out for an eve-

---

1. Eric, who had just completed his junior year    in high school, lived with his uncle and aunt—

ning on the town. While driving around in a pickup truck belonging to Eric's uncle, the boys began to drink some beer they purchased at a convenience store. At one point they stopped at the home of Eric's girlfriend where they were told about a party being held at a house located near the Tulsa airport. Eventually they arrived at the party. While at the party Eric and his girlfriend got into a quarrel, so the boys left and headed for the Caravan—a teen nightspot. Devon stayed in the pickup while Eric attempted to gain admittance. This was refused because a bouncer concluded that Eric was too drunk.

Once back in the pickup, Eric headed for home in an effort to comply with a parental 12:30 a.m. curfew. While proceeding south on Sheridan Avenue [2] the driver of another vehicle pulled up alongside Eric's truck and "started goosing the gas and act[ing] like he wanted to race."

Eric turned to the sleeping Devon to point out the commotion being caused by the driver of the other vehicle, which by this time had changed lanes and was now on the right side of Eric's vehicle. Devon woke up, rolled down his window, and began yelling and "mouthing-off" to the occupants of the other vehicle. At this point someone in the other vehicle brandished a gun and threatened to shoot.

Both vehicles stopped at a red light. Devon got out of the truck and walked around to the passenger's side of the other vehicle. Eric heard a "pop" above the loud sound level of the truck radio, and saw Devon drop down to one knee. Eric jumped out of the truck and grabbed Devon as the other vehicle sped away.

Eric helped his friend up and put him back into the truck. Because Eric had heard what sounded like a gunshot, he said he "looked all over [Devon's] body and there was no blood on him or anything." Eric asked Devon if he had been shot and he answered, "Yeah, I have been shot." Instead of driving his moaning friend to the nearest hospital, however, Eric says he set out in pursuit of the other vehicle in an

effort to get its license number. Unable to find it, he headed on home where he arrived about 12:30 a.m., some fifteen minutes after the confrontation with the other vehicle. There, at the door, Eric was greeted by defendants John and Shirley O'Neal. He did not then mention the shooting incident but said only that his friend was intoxicated and asked if Devon could spend the night.

Defendant Shirley O'Neal rejected the request and called Devon's mother, plaintiff Darlene James. Mrs. O'Neal told Mrs. James that she thought the boys had been drinking; that Devon was "acting rowdy ... like jumping ... on the car ... and kind of just acting up in the garage" and "hollering around out there—whooping around." Mrs. James was asked to come and get Devon and was advised by Mrs. O'Neal that she thought he was hot and perhaps was getting sick. Mrs. James agreed to retrieve Devon but said she needed time and Mrs. O'Neal agreed to keep him comfortable until she arrived. This was about 12:45 a.m.

Mrs. James told her husband, plaintiff William James, that she was going to pick Devon up but she did not tell him that Devon had been drinking for fear he would become angry. She delayed leaving the house for about fifteen minutes, speculating that "maybe [Devon would] go to sleep ... and he would be kind of quieted down."

After making the call, Mrs. O'Neal told Eric to try and make Devon comfortable and then come in and tell them about what the boys had done that night. It was a warm evening and Eric placed Devon on a pad or blanket in the garage and removed all of his clothing except his boxer shorts. Following this he went into the kitchen, and among other things, told his aunt and uncle about being chased down Sheridan Avenue by several boys in a car, the exchange of words, the brandishing of the gun, Devon going over to the other vehicle, hearing a shot, seeing Devon fall, helping him back to the pickup, and being told by Devon that he had been shot.

defendants John and Shirley O'Neal.

**2.** In the city of Tulsa, Oklahoma.

The foregoing undisputed evidence is important. For it put the O'Neals on notice at around 1:00 a.m. that Devon may have been shot. Devon was conscious at this time but according to Mrs. O'Neal was "hot and perhaps getting sick."

To make a bad situation worse, Mrs. James did not go straight over to the O'Neal house after receiving the James call. Instead she went to pick up a friend to help her handle Devon, one Faysemma Cannon and, because of a delay there, did not arrive at the O'Neal residence until about 3:30 a.m., according to Mrs. James. As they pulled into the driveway, the waiting defendants opened the garage door and Mrs. James observed Eric and Devon lying on a blanket spread out on the garage floor.

Mrs. James approached and attempted to awaken her son. To her horror she found that his body was cold. "Oh, no. Devon's dead," she exclaimed.

Frantic now, she ran into the defendants' home, screamed at Mrs. O'Neal and then called her husband. She told him that Devon was not breathing. He advised her to administer CPR and said he would come right over. Mrs. James said she did not see the gunshot wound, but she did notice "he had places on him that ... looked like someone might have hit him or something [like] bruises."

An ambulance and the police were called. Efforts to revive Devon were unsuccessful and he was pronounced dead at the scene. When Mr. James arrived he embraced his son and was later told that the police discovered a bullet entry hole in Devon's abdomen below the belt line of his boxer shorts.

On February 10, 1988, the plaintiffs filed this lawsuit against Eric and the O'Neals.[3] Their amended petition alleged that the defendants "did willfully, recklessly or negligently undertake the care of Devon James

who had then been critically shot and wounded." They further claimed that "as a result of their care, or lack thereof, Devon James died ... while in their control and under their care" for which they sought actual and punitive damages of $1,000,000.

On July 18, 1989, the defendants filed a motion for summary judgment. A hearing on the motion was held November 27, 1989, and the court sustained the motion and entered judgment in favor of the defendants.[4]

From this ruling the plaintiffs timely appeal.

## II

The plaintiffs' principal assignment of error is that the trial court erred in rendering a summary judgment for the O'Neals.

I agree. Summary judgment is appropriate only when it appears that there is no substantial controversy as to any material fact and that one party is entitled to judgment as a matter of law. *Flanders v. Crane Co.*, 693 P.2d 602 (Okl.1984). Summary judgment is *inappropriate* where reasonable men might reach different conclusions on the *undisputed* facts. *Runyon v. Reid*, 510 P.2d 943, 58 A.L.R.3d 814 (Okl.1973).

In my opinion, under the undisputed facts in this case, reasonable men could differ on this critical material fact: Whether the defendants breached their duty of care to the intoxicated decedent after learning of facts and circumstances sufficient to put them on notice that Devon had probably been shot. As a result, I would hold that such material issue of fact exists which requires resolution before a valid judgment can be rendered. *See Hargrave v. Canadian Valley Coop., Inc.*, 792 P.2d 50 (Okl.1990); *Weldon by and through Weldon v. Seminole Mun. Hosp.*, 709 P.2d 1058 (Okl.1985); *Anson v. Erlanger Minerals & Metals, Inc.*, 702 P.2d 393 (Okl. App.1985).

---

3. Also named as defendants were Robert Wilkins, who was the assailant later convicted of shooting Devon; and Roger Bocher, another occupant of the Wilkins vehicle. The allegational claims of an intentional tort were directed towards these co-defendants.

4. Defendant Riley also filed a motion for summary judgment which was denied by the trial court, and is not a subject of this appeal.

The plaintiffs contend that the defendants "voluntarily assumed the duty to care for [their decedent whom] they knew or should have known was shot and injured." They argue that in *Nye v. Cox*, 440 P.2d 683 (Okl.1968), the supreme court adopted the general rule that one who assumes the care of an injured person is charged with the duty to provide proper care and attention. The plaintiffs also cite *Farwell v. Keaton*, 396 Mich. 281, 240 N.W.2d 217 (1976), as supportive of their argument that the defendants had a duty to provide medical care to their injured decedent.

It is, of course, true that one who voluntarily takes charge of a helpless person must exercise reasonable care for his welfare and safety.[5] Here the defendants did attempt to aid Devon and did take charge and control of the situation during the critical period of Devon's last living hours. Such voluntary undertaking carried with it various attendant responsibilities. *See* W. Prosser, *Law of Torts* 343 (4th ed. 1971). Nor are the defendants absolved of liability by virtue of our Good Samaritan Act. *See* 76 O.S.1981 § 5(a)(2).[6]

The majority concludes that the defendants had no duty to Devon because they did not know that he was shot or injured. In reaching this conclusion it appears to me my colleagues are deciding as a matter of law that the defendants were at liberty to disbelieve or ignore the information given them about the shooting because of Devon's having been drinking earlier in the evening. This in my opinion invades the province of a jury. So does the majority's drawing of the inferences from the facts—

that Devon was merely "drunk" and his actions at the defendants' home were not "indicative of a fatal or even nonfatal gunshot wound." These findings reach beyond our review jurisdiction for summary judgment. This effort should be left to a jury.

Whether the O'Neals used reasonable care under the circumstances existing that fateful night is for the jury to decide unless all the facts are such that reasonable men must draw the same conclusions. *Hubbard v. Coates*, 444 P.2d 204 (Okl. 1968). The burden of proof is particularly heavy on a party moving for summary judgment in a negligence action. *Smith v. American Flyers, Inc.*, 540 P.2d 1212 (Okl. App.1975).

The majority concedes that the evidence is undisputed that Eric, just shortly before returning to the defendants' home, had been denied admission to the Caravan because he was too intoxicated. Whether Mrs. O'Neal's request for an intoxicated Eric to, in effect, "check on" Devon and to make him comfortable satisfies the duty of care required of her under the undisputed circumstances is a question upon which reasonable men might differ. And whether it was reasonable for the defendants to then rely upon such cursory examination of a possible gunshot victim by an intoxicated eighteen-year-old boy *must* also be left to the jury. It was irrelevant whether Devon requested medical attention or not. What was important was that Devon told Eric that he had been shot and Eric relayed that information to the O'Neals.

Under such circumstances, the jury could find that due care required more of the O'Neals than to simply keep Devon comfortable and rely on a physical examination

---

**5.** The Restatement (Second) of Torts § 324 provides:
"One who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by
(a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or
(b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him."

**6.** Section 5(a)(2) provides that:
"Where no prior contractual relationship exists, any person who in good faith renders or attempts to render emergency care consisting of artificial respiration, restoration of breathing, or preventing or retarding the loss of blood, or aiding or restoring heart action or circulation of blood to the victim or victims of an accident or emergency, wherever required, shall not be liable for any civil damages as a result of any acts or omissions by such person in rendering the emergency care."

by Eric for signs of a gunshot wound. Reasonable men could differ on the material issue of fact concerning whether reasonable care required the O'Neals to (1) examine Devon themselves for signs of personal injury; (2) immediately notify Devon's parents of the shooting information; (3) call 911 for emergency medical help; (4) take Devon to the nearest hospital; or (5) simply try to keep Devon comfortable until his uninformed parents arrived.

In other words what this case boils down to is this: Since the defendants undertook to care for or treat the intoxicated young decedent during the critical period preceding the arrival of his mother, they had a legal duty to use reasonable care in doing so. Whether their actions, after being informed of the possibility of a gunshot wound, were a reasonable exercise of their duty of care is a question to be resolved by the jury, not this court. *See generally Wofford v. Eastern State Hosp.*, 795 P.2d 516 (Okl.1990); *Brown v. C.H. Guernsey & Co.*, 533 P.2d 1009 (Okl.App.1973).

### III

I would reverse the summary judgment and remand the cause for further proceedings.